BEFORE THE OFFICE OF STATE ADMINISTRATIVE HEARINGS
STATE OF GEORGIA

J.F., BY AND THROUGH J.A.; AND
J.A.,
               **Petitioner,**

**v.**

**FULTON COUNTY SCHOOL
DISTRICT,**
              **Respondent.**

**Docket No.: 1920354
1920354-OSAH-DOE-SE-60-Malihi**

**Agency Reference No.: 2327821061**

FILED
OSAH

JAN 2 1 2020

Kevin Westray, Legal Assistant

## FINAL DECISION

### I.   INTRODUCTION AND RELEVANT PROCEDURAL BACKGROUND

On or about December 14, 2018, J.F., by and through his guardian J.A., and J.A. ("Petitioners") filed a Due Process Hearing Request ("DPHR") pursuant to the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA" or "Act"), 20 U.S.C. §§ 1400 to 1482, and its implementing regulations, 34 C.F.R. Part 300, against Respondent Fulton County School District ("FCSD" or the "District."). Although the parties attempted to resolve the matter outside of this tribunal, they informed the Court on February 5, 2019, that they had reached an impasse. A hearing initially was scheduled for May 7-10, 2019. The parties then attempted mediation. On June 25, 2019, the parties reported to the Court that they were unable to reach any agreements and all claims remained disputed. The hearing before the undersigned was rescheduled for September 4-6 and 9, 2019. The hearing went forward on September 4, but on the next day, September 5, 2019, Respondent filed an emergency motion to continue, which was granted. Thus, the hearing ultimately was held on September 4, 24, 25, 26, and 27, 2019. Petitioners were represented by Craig Goodmark, Esq., and Jonathan Zimring, Esq. The District was represented by Jeffrey Daniel, Esq., and Samantha Lewis, Esq. The record remained open

until December 4, 2019, to allow the parties to file Proposed Findings of Fact and Conclusions of Law. After careful consideration of the evidence of record in this case, and for the reasons stated below, Petitioners' request for relief is **GRANTED**.

## II.    FINDINGS OF FACT

### A.    *Background*

1.

J.F. is seven years old and currently attending New Prospect Elementary School in the District. (Testimony of J.A. at Transcript [hereinafter, "T."] 682-84, 796.)

2.

J.F. is eligible for special education services under the category of Significantly Developmentally Delayed ("SDD"). His current educational placement is in the Georgia Network for Educational and Therapeutic Support ("GNETS")[1] program housed at New Prospect. (Pet. J. Ex. 7, 13.)

### B.    *Kindergarten at River Eves Elementary School; Behavioral Problems; SST*

3.

During the 2017-18 school year, when J.F. was five years old, he was enrolled in kindergarten at River Eves Elementary School in the District. He was enrolled in this particular school because J.A., who was a teacher working in the District, requested and was granted a hardship transfer enabling J.F. to attend school near the location where she was teaching. (Testimony of J.A. at T. 682-84.)

---

[1] GNETS is a statewide program established by the Georgia Department of Education, pursuant to legislative act. The North Metro region of GNETS serves Fulton County. It provides intensive therapy and supports. (Testimony of C. Holifield at T. 1416-17, 1419.)

4.

J.F. immediately began to have behavioral problems at River Eves and was disciplined twice within the first week of school. Thereafter, J.F. had "almost daily" behavior issues, including running out of the classroom, having difficulty calming down, and hitting and kicking teachers. (Testimony of J.A. at T. 686, 702-03; Pet. J. Ex. 51.)

5.

On August 16, 2017, J.A. completed a Tier 3/SST Parent Questionnaire. In a letter dated August 28, 2017, she requested "comprehensive educational testing" in "all suspected areas of disability." She asked for evaluations to be completed before the next SST meeting. (Testimony of J.A. at T. 686, 691-92; Pet. Joint Ex. 4.)

6.

On August 29, 2017, the school sent home forms showing that because J.F. had not passed his hearing or vision screening, "they couldn't move forward" with evaluations. Before J.A. could follow up, J.F.'s hardship transfer was revoked due to his behavior. J.A. was directed to leave FCSD and enroll J.F. in the school district in which the family was living. Rather than subject J.F. to repeated transitions, because the family would soon be moving to Fulton County, J.A. homeschooled J.F. until October 2, 2017. (Testimony of J.A. at T. 692-93, 698.)

C.  **Kindergarten at Dolvin Elementary School; IDEA Eligibility Determined; Initial Services Provided; Decision to Place J.F. in GNETS**

7.

On October 2, 2017, J.A. enrolled J.F. in Dolvin Elementary School within the District. That same day, Dolvin staff held an SST meeting. J.A. explained during the meeting that "when J.F. is upset, his verbal abilities is almost mute." She also informed the staff that J.F. elopes when frustrated and could become aggressive if he is blocked during elopement. The team

incorporated J.A.'s suggested behavior strategies into the SST plan. Participants in the meeting included J.F.'s kindergarten teacher, Jessica Hemmann, and the school principal, Laura Zoll. (Testimony of J.A. at T. 698, 847-48; J. Hemmann at T. 900-01; L. Zoll at T. 1008; Pet. Joint Ex. 6.)

8.

Also on October 2, 2017, J.A. signed forms consenting to comprehensive evaluations of J.F. FCSD school psychologist Maureen Innes conducted a psychological evaluation on October 10 and 12, 2017. FCSD speech-language pathologist Laurie Kaplan conducted a speech-language evaluation on October 24-25, 2017. (Testimony of J.A. at T. 704-05; Pet. Joint Ex. 18, Pet. Joint Ex. 19.)

9.

At Dolvin, J.F. exhibited behaviors such as elopement, throwing objects, and turning things over in the classroom. He received twenty-nine disciplinary referrals between October 12, 2017, and October 27, 2017. During the fall semester, he was repeatedly physically restrained by staff. According to his teacher Ms. Hemmann, J.F. hit her and other staff members every day. He caused bruising and bleeding. He also hit other kindergartners. Ms. Hemmann's other students missed approximately 30-45 minutes of instruction time each day due to J.F.'s behavior. Administrators were on call to respond to J.F.'s behavioral incidents. The school developed a crisis plan, the first that Principal Laura Zoll had ever had to implement in her 31 years in education. (Testimony of J. Hemmann at T. 903, 914-16; L. Zoll at T.1011, 1014; Pet. Ex. 35a.)

10.

On October 27, 2017, an eligibility meeting was held, and the team determined that J.F. was eligible for special education services under the category of SDD. He was not found eligible for speech services. An IEP was developed that provided three hours per day of special education support. He was placed in a co-taught setting for reading, writing, and math, and a general education setting for all other subject areas. He remained in Ms. Hemmann's general education classroom, and Ms. Allison Polaski co-taught with her. The IEP included one annual goal targeting behavior. It did not contain behavioral supports or a behavior intervention plan ("BIP"), nor did it include any supplemental aids or services. J.A. testified that she thought J.F. "needed more." J.A. advised the team that J.F. would be evaluated for occupational therapy ("OT") in November and that she would provide the evaluation once she had received it.[2] (Testimony of J.A. at T. 719-21; J. Hemmann at T. 922-23; A. Polaski at 1125-26; Pet. Joint Ex. 7, Pet. Joint Ex. 8, Joint Ex. 9.)

11.

Between October 27, 2017, and November 17, 2017, J.F. continued to struggle with his behavior. He received fifteen discipline referrals in fifteen school days, and he was suspended for school disruption on November 17, 2017, which happened to be the day of the second IEP meeting. (Testimony of J. Hemmann at T. 971; Pet. Joint Ex. 10; Pet. Ex. 35a.)

12.

At the IEP meeting on November 17, 2017, the team considered a functional behavior assessment ("FBA") that completed on November 16, 2017, by Board Certified Behavior Analyst Shanee Halbert, owner of Comprehensive Behavioral Change. J.A. was concerned

---

[2] It is unclear form the record whether a November 2017 OT evaluation was ever provided by J.A. to the District.

about whether the FBA provided sufficient detail regarding triggering antecedents. She also objected to the team's decision to move J.F. to a more restrictive setting. As a result of the November 17, 2017 IEP meeting, J.F. was placed in a special education setting in Ms. Polaski's interrelated resource room for reading and writing. For math, J.F. would remain in the co-taught setting. He was provided with a paraprofessional during lunch and recess as well as BCBA support for six hours per week beginning November 27, 2017. (Testimony of A. Polaski at T. 1128; Pet. Joint Ex. 10; Pet. Joint Ex. 21.)

13.

During the month of November 2017, the District developed a BIP for J.F. The District engaged Dr. Jennifer Alexander, an independent BCBA, to help train Dolvin staff and implement the BIP. In December of 2017, Dr. Alexander began working with J.F. She helped to update the BIP and trained Dolvin staff on how to use clickers to collect data regarding J.F.'s behaviors. (Testimony of J. Alexander at T. 1225, 1227, 1232, 1234-35; Pet. Joint Ex. 10; Pet. Joint Ex. 22.)

14.

Between November 2017 and January 2018, J.F. continued to have behavioral challenges, including elopement, aggression, and property damage. He was repeatedly restrained and removed from his classroom. He also had problems starting and finishing academic tasks. The BIP provided that when J.F. engaged in problem behaviors, he would be taken to a calm-down room. Depending on the day, it might take J.F. as long as 90 minutes to de-escalate. The process of de-escalation required Ms. Polaski, an administrator, and a paraprofessional. Typically, one of them would track the acts of aggression using a clicker while the other two traded off blocking J.F.'s hitting and kicking. (Testimony of A. Polaski at T. 1126-27, 1139, 1141-42; J.A. at T. 754-55; P. Ex. 35a.)

15.

A third IEP meeting was held on January 12, 2018.  J.A. expressed her concerns regarding J.F.'s continuing behaviors as well as the school's use of a "calm down room" and physical restraint.  School staff introduced GNETS as a potential placement.  J.A. disagreed with the suggestion of GNETS and requested data to support a need for a more restrictive setting. Progress reports from December 2017 showed emerging progress.  The team determined that J.F.'s behaviors were continuing to interfere with progress, however; for example, in his math co-taught setting, J.F. was typically only able to work on a task for five out of twenty minutes. The decision was made to place J.F. in a special education setting for homeroom, recess, and two-thirds of a math segment.  He was provided a 1:1 categorical paraprofessional in his core classes, specials, recess, lunch, transitions, and grade-level activities.  The team also reviewed OT observations of J.F. and determined that more observation was needed before making any recommendations about OT services.  (Testimony of J.A. at T. 755; Pet. Joint Ex. 11; Pet. Joint Ex. 38.)

16.

On the same day, January 12, 2018, CBC developed a new BIP for J.F.  It included functional communication training ("FCT") that involved a red/green card system under which J.F. was required to engage in work while the red card was displayed and then granted play time when the green card was displayed.  (Testimony of J. Alexander at T. 1233; J. Trotman at T.124; Pet. Joint Ex. 23.)

17.

On February 1, 2018, the District sent a Consideration for Services Request to GNETS. J.A. was unaware that the District had taken this step. (Testimony of J.A. at T. 768-69; Pet. Joint Ex. 36.)

18.

GNETS placements are based upon data collected by the school making the referral. Once the referral packet is received by GNETS, "the IEP team meeting is called" to discuss the data and determine the services. GNETS employs a process called "triangulation" to determine placement. The three pieces of information that are triangulated are the BASC-3, the SDQ, and the student's social history. The BASC-3 is a standardized and nationally normed instrument used by psychologists to identify areas where the child might have behavioral needs. The SDQ, unlike the BASC-3, is a screener and not a psychometric-normed instrument. The social history is based upon information contained in a child's psychological report, developmental history and a meeting with the student's parent. (Testimony of C. Holifield at T. 1430-31, 1455, 1459-60, 1462; Pet. Ex. 57.)

19.

According to Robert Abernathy, the District's Special Education Coordinator and GNETS liaison, the submission of a GNETS referral does not mean that the IEP team has already made a placement decision. He has been involved in GNETS referrals that ultimately did not lead to a GNETS placement. Dr. Charlotte Holifield, Director of the North Metro GNETS, explained that when a school refers a student to GNETS, it is not a foregone conclusion that a student will be placed there. (Testimony of R. Abernathy at T. 1826-27; C. Holifield at T. 1416.)

20.

On February 20, 2018, a fourth IEP meeting was held.[3]  The team discussed the intensity

of J.F.'s behaviors, including aggression, elopement, non-compliance, and destruction of

property.  They further discussed J.F.'s academic performance and concern for J.F.'s safety and

the safety of others.  The team discussed services offered by GNETS.  GNETS was scheduled to

observe J.F. on February 27, 2018, and to complete a social in-take with J.A.  J.A. believed there

had not been sufficient time for the interventions already in place to work.  The team noted that

J.F.'s OT evaluation was in progress.  Evaluation in speech/language was included as an action

item.  (Testimony of J.A. at T. 769; Pet. Joint Ex. 12.)

21.

Between February 20 and March 16, 2018, J.F.'s behavior improved in the resource

setting.  He experienced several days with zero incidents of aggression, prompting Dr. Alexander

to increase the red interval.  Subsequently, his behavior incidents spiked.  (Testimony of J.

Alexander at T. 1272-73, 1278; Pet. Joint Ex. 39.)

22.

The District engaged BCBA Jeron Trotman of Southern Behavioral Group to conduct an

independent FBA, including a functional assessment ("FA") to determine why J.F.'s behaviors

were occurring.  Mr. Trotman completed his evaluation in March of 2018.  He determined that

the FCT red/green card system was not appropriate for J.F.; because J.F. could not tolerate the

delay caused by red card, and because the system was not implemented with fidelity by staff, the

---

[3] J.A. testified that she was contacted on February 20, 2018, by Dr. Alexander and asked to come to school for an informal conference.  Upon her arrival, J.A. was given an invitation dated February 20, 2018, for an IEP meeting to be held the same day.  Although she attended this meeting, J.A. felt that she had been unable to properly prepare for it and thus was unable to reasonably participate.  (Testimony of J.A. at T. 764-65.)

system actually caused increased aggressions. Mr. Trotman opined that the function of J.F.'s behaviors were "escape" and "interrupt" conditions. His recommendations included differential reinforcement, environmental modifications, visual aids, use of "do" rather than "don't" requests, and training and supervision of staff. Mr. Trotman further recommended that J.F. continue his work in the general education setting and use a separate room when he requires additional support on concepts. (Testimony of J. Trotman at T. 79, 87, 97, 102, 182; A. Polaski at T. 1146; J. Alexander at 1238; Pet. Joint Ex. 26.)

23.

As noted, J.F.'s teachers used clickers to collect data regarding his behaviors. Mr. Trotman believed the data collected by J.F.'s teachers was not completely accurate. For example, data from February 8, 2018, indicated 855 separate incidents of aggression in only 30 minutes. Similarly, data from February 27, 2018, indicated 1,251 separate incidents of aggression in 50 minutes, and data from Match 1, 2018, indicated 7,637 incidents of aggression. (Testimony of J. Trotman at T. 127-32.)

24.

On March 2, 2018, CBC again updated the BIP for J.F. to adapt it for J.F.'s new placements. (Testimony of J. Alexander at T. 1233; Pet. Joint Ex. 24.)

25.

On March 12, 2018, Allison Bartelson, a FCSD OT, completed an OT evaluation of J.F. She determined that he "was demonstrating functional fine motor, visual skills, self-care to complete the necessary school related tasks" and that his "behavioral concerns involving aggression and verbal outbursts negatively impact his ability to successfully function in the

school." She concluded that his behaviors did not have a sensory component. She did not think OT services were necessary for J.F. (Testimony of A. Bartelson at T. 1746; Pet. Joint Ex. 20.)

26.

On March 16, 2018, an annual review IEP meeting was held. Mr. Trotman was invited to present his results, though he was excused from the meeting before discussion began. Dr. Alexander reviewed the progress on J.F.'s behavioral objectives and explained the expected behavioral spikes that followed changes in the FCT system. J.F. was no longer eloping out of the classroom. He was completing more work. His incidents of aggression had decreased. Ms. Halbert, the FCSD BCBA, and Dr. Alexander, the private BCBA, both believed that J.F. would master the IEP objective related to aggression. Ms. Bartelson presented her OT findings. The team did not recommend any speech or OT services for J.F., nor did they add any supplemental aids or supports to his educational program. Over J.A.'s objection, the team concluded that "therapeutic services provided by GNETS (New Prospect Elementary School) in a special education setting is required in order to provide J.F. FAPE [a free appropriate public education]." As explained by Principal Zoll, the Dolvin team believed it had exhausted all its resources and that J.F. needed more support than they could provide. (Testimony of L. Zoll at T. 1028; J. Trotman at T. 104-05; J. Alexander at T. 1319; J. Hemmann at T. 998-99; J.A. at T. 785, 790; Pet. Joint Ex. 4, Pet. Joint Ex. 13; Pet. Ex. 14.)

**D.    *Home School for Remainder of Kindergarten Year; Summer ADHD Diagnosis***

27.

In or around April of 2018, J.A. removed J.F. from school. She taught him at home for the remainder of the 2017-18 school year. (Testimony of J.A. at T. 795-96.)

28.

During the summer of 2018, J.F. was diagnosed with attention deficit hyperactivity disorder and began taking ADHD medication. The medication positively impacted his behavior, making him calmer, less prone to tantrums, and better able to communicate his emotions. (Testimony of J.A. at T. 796-97.)

### E.    First Grade at New Prospect Elementary School; GNETS Placement

29.

In August 2018, J.F. returned to school for the 2018-19 school year. He was enrolled at New Prospect Elementary School in the District and began the GNETS placement. (Testimony of J.A. at T. 796.)

30.

J.F.'s teacher at New Prospect is Mr. Rafael Jordan. There are five students in the class, including J.F. The students are of varying ages Mr. Jordan's classroom is also staffed with his assistant and J.F.'s categorical paraprofessional. At New Prospect, the GNETS classrooms are located within the school building on the second- and third-grade hallway. (Testimony of R. Jordan at T. 1490, 1500; A. Lemons at 1373-74.)

31.

Mr. Jordan completed a BASC-3 assessment based upon J.F.'s performance from August 2018 to October 2018. The assessment did not identify that J.F. had any behaviors that required any interventions. (Testimony of R. Jordan at T. 1561-65; Pet. J. Ex. 28.)

32.

Between August 2018 and October 2018, J.F. mastered the goal and objectives in the IEP that had been created on March 16, 2018, and subsequently was reviewed on April 20, 2018. (Testimony of R. Jordan at T. 1553; J.A. at T. 812; Pet. Joint Ex. 13; Pet. Joint Ex. 38; Pet. Joint Ex. 46.)

33.

A reintegration plan is typically developed within six to eight weeks of a student's entrance into GNETS. Such a plan would address an eventual transition out of GNETS. GNETS procedures, as set forth in the North Metro GNETS Staff Handbook & Procedural Manual (2018-2019), require that an IEP team "assess at least annually whether the student with disabilities is ready to transition to a less restrictive setting. Progress monitoring data aligned with IEP goals should be reviewed to determine if the student is ready to receive a free appropriate education (FAPE) in the lesser restrictive environment." The GNETS procedures further provide that the IEP team "will consider the various setting in which GNETS services may be delivered and determine whether the individual student is likely to receive FAPE in each environment, beginning with the least restrictive setting." The North Metro GNETS reintegration plan includes five steps, the first of which is "Student meets the mastery criteria for all IEP behavioral goals," and the second of which is "Student "begins reintegrating from the current LRE [least restrictive environment] to the next less restrictive environment." J.A. was unaware of the details of the five-step reintegration process. Mr. Jordan explained the process as identifying a subject the student is strong with and "get[ting] him out one class at a time." (Testimony of C. Holifield at T. 1433-34, 1437; J.A. at T. 813; R. Jordan at 1523-24; Pet. Joint Ex. 37 at 623, Pet. Ex. 52 at 15-16.)

34.

In October of 2018, the IEP team met to review J.F.'s progress and amend the IEP. The behavioral goal was changed from 102 incidents of aggression per day to 2 incidents per day.[4] The October 2018 IEP noted J.A's concern with the special education setting of GNETS and stated that the team "will consider outclasses with 6 weeks of consistent progress in his behavioral data."[5] In other words, the team did not discuss serving J.F. in a less restrictive setting, even though the previous goal had been mastered. He continued to attend all academic classes in the GNETS setting. Other than altering the level of mastery on the behavioral objectives, the October IEP plan, including its dearth of services and supports, was identical to the April 2018 plan. (Testimony of J.A. at T. 812, 814; Pet. Joint Ex. 15.)

35.

In February of 2019, Mr. Trotman observed J.F. in Mr. Jordan's class. He determined that Mr. Jordan was not fully implementing the BIP developed and updated by CBC for J.F. and set forth in the IEP.[6] Mr. Jordan used a class-wide token economy system whereby his students earned or lost "Jordan Bucks" for meeting or failing to meet behavioral goals. Mr. Trotman was concerned that this system used punishment rather than reinforcement. According to Mr. Jordan, however, J.F. responded well to the token economy system. Mr. Jordan understood the BIP and began using clickers to collect data, in accordance with the BIP. (Testimony of J. Trotman at T. 140, 177-79; R. Jordan at T. 1498-1501, 1504-06.)

---

[4] Mr. Trotman opined that this expectation that behavior incidents would be reduced from 102 to 2 incidents per day was a "huge jump" and was not best practices.   (Testimony of J. Trotman at T. 139.)

[5] Mr. Jordan testified that a change in J.F.'s placement could only be considered if J.F.'s aggressions dropped to zero.  (Testimony of R. Jordan at T. 1523.)

[6] Dr. Alexander did not train Mr. Jordan, as she had trained Dolvin staff, nor did she monitor J.F. once he was at GNETS. (Testimony of R. Jordan at T. 1559-60; J. Alexander at T. 1280.)

36.

By the end of the 2018-2019 school year, J.F. was averaging approximately 27 incidents of aggression per day. (Testimony of R. Jordan at T. 1508.)

**F.**     ***Second Grade at New Prospect Elementary School; Continued GNETS Placement***

37.

J.F.'s behavior continued to improve during the current school year, 2019-2020. (Testimony of R. Jordan at T. 1512-13.)

**G.**     ***The Appropriateness of the Current IEP, Particularly the GNETS Setting***

38.

Educational consultant Dr. Holly Ward does not recommend that J.F. continue in the GNETS placement.  According to Dr. Ward, the LRE for J.F. is a co-taught setting with appropriate supports and services where J.F. will have access to a more rigorous academic program based upon grade-level standards.  A co-taught classroom combines students with disabilities and non-disabled students into one setting where skill groups work together, offering J.F. the opportunity to communicate with students who have normal functioning communication. Dr. Ward based her opinion on meetings with J.F. and his family, direct observations of J.F.'s current educational placement, and review of his educational records.  Dr. Ward noted that during her observation of J.F. in the GNETS setting, in the spring of 2019, he did not exhibit any of the behavioral challenges addressed by his current IEP; she also stated that the lesson she observed in the GNETS classroom was less complex and extensive and the length of time spent

on the lesson was greater than in a typical general education class.[7] (Testimony of H. Ward at T. 420-22, 424-25, 468-69, 489-90, 493-94, 502-04, 515-16.)

39.

Mindy Cohen is an expert in speech language pathology. Ms. Cohen's independent evaluation of J.F., dated June 2019, identified a speech sound disorder, a significant mixed receptive-expressive language disorder, a social communication disorder, and a reading disorder resulting from an auditory processing delay and weak phonological awareness skills. Ms. Cohen recommends that J.F. receive intensive speech language therapy to address his significant language delays; she also recommends specialized academic instruction to address J.F.'s delays in reading and Fast ForWord, a brain plasticity computer training that improves a student's ability to process orally presented information. (Testimony of M. Cohen at T. 260-62, 272, 313-14; Pet. Ex. 69.)

40.

Occupational therapist Kimberly Wing's independent evaluation of J.F., dated April 16, 2019, included the following assessments: the Miller Function and Participation Scales (M-FUN), Beery-Buktenica Test of Visual Motor Integration-6 (VMI-6), and Sensory Profile-2 (SP2). She also conducted clinical observations and observed J.F. in the GNETS classroom. Ms. Wing determined that J.F. had good perceptual and cognitive abilities, but he had a low threshold for input. According to Ms. Wing, J.F. exhibited a "definite weakness with retained reflexes and with sensory processing, his processing speed, muscles tone, fine motor." Ms. Wing noted that J.F. experiences anxiety and frustration as a result of his weaknesses and his limited motor output. She opined that J.F.'s weaknesses "impact the development of the higher-

---

[7] Mr. Jordan testified that he tries to keep up with the pace of a general education classroom. When the class gets behind, they "try to catch up" and "usually" at the end of the year, he has reached the point in the statewide curriculum that he was supposed to reach. (Testimony of R. Jordan at T. 1507.)

level skills of behavior, attention, and social participation." Ms. Wing observed J.F. at GNETS. She  noted that J.F.'s "cognitive potential and understanding of material was beyond that of his current classmates, and it appears that some of their behaviors, disruptions and lack of awareness were the triggers for his frustration." Ms. Wing concluded that J.F. qualifies for occupational therapy and that he needs individual and group therapies; she noted that J.F. has fine motor needs that impact his educational performance and that his handwriting and motor planning are weak. Specifically, Ms. Wing recommends individual OT therapy of two thirty-minute sessions per week (to be able to sit in class and to work on ocular motor skills and fine motor skills) as well as group therapy of two thirty-minute sessions and one thirty-minute consult each week.  She further recommends a regulation program,  social skills group, and placement with the same-age peers.  Her recommendations can be implemented in any educational placement. (Testimony of K. Wing at T. 562-64, 566, 578, 581-88, 597, 602-03, 614, 616-20, 663, 675-79; Pet. Ex. 6.)

41.

GNETS is the most restrictive placement on the continuum (disregarding the option of residential placement).   Whether a student's current placement is the least restrictive environment  is considered each time the IEP team convenes.  Once a student shows progress in the more restrictive setting, the IEP team should move the student to a less restrictive setting. When students are moved from less to more restrictive setting, the IEP team should discuss whether and how much a student will interact with non-disabled children during the school day. (Testimony of  H. Ward at T. 450, 461-63, 472; R. Jordan at T. 1536-9; T. Gilland at T. 65-66; R. Abernathy at T. 223.)

### III.   CONCLUSIONS OF LAW

1.

Petitioners bear the burden of proof in this matter.  Schaffer v. Weast, 546 U.S. 49, 62 (2005).  The standard of proof is a preponderance of the evidence.  Ga. Comp. R. & Regs. 616-1-2-.21(4).

2.

Under both the IDEA and Georgia law, students with disabilities have the right FAPE.  See 20 U.S.C. § 1412(a)(1); 34 C.F.R. §§ 300.1- 300.102; Ga. Comp. R. & Regs. 160-4-7-.01(1)(a).  The Supreme Court has developed a two-part inquiry to determine whether the school district has provided FAPE: "First, has the State complied with the procedures set forth in the Act?  And second, is the individualized education program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?"  Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982).  Ultimately, a school must offer an IEP "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  Endrew F. v. Douglas Cnty. Sch. Dist., 137 S. Ct. 988, 1001 (2017).

3.

The IEP is developed by the IEP team, including the parents. 34 C.F.R. §§ 300.324, 300.321(a)(1); R.L. v. Miami-Dade Cnty Sch. Bd., 757 F.3d 1173, 1177 (11th Cir. 2014) (IEP is "the culmination of a collaborative process between parents, teachers, and school administrators . . . with the goal of providing the student with [FAPE].").  In part, an IEP is to include the following:

> A statement of the special education and related services and supplementary aids and services . . . to be provided to the child . . . and a statement of the program modifications or supports for school personnel that will be provided to enable the child . . . to

> participate in extracurricular and other nonacademic activities; and
> ... be educated and participate with other children with disabilities
> and nondisabled children . . . .

34 CFR § 300.320(a)(4)(ii), (iii). "Supplementary aids and services" include "aids, services and other supports that are provided in regular education classes, other education-related settings, and in extracurricular and nonacademic settings, to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate." 34 CFR §300.42; Ga. Comp. R. & Regs. 160-4-7-.21(41). "Related services" encompass those supportive services that "are required to assist a child with a disability to benefit from special education." 34 CFR §300.34; Ga. Comp. R. & Regs. 160-4-7-.21(36).

4.

To the maximum extent appropriate, a local education agency, such as FCSD, is tasked with educating the child in the LRE or, in other words, "with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A); Ga. Comp. R. & Regs. 160-4-7-.07 (1)(b)(2010); see also Greer v. Rome City Sch. Dist., 950 F.2d 688, 695-96 (11th Cir. 1989) (adopting a two-part inquiry to determine LRE placement). Before concluding that a student should be educated outside of the general education setting, a school district "must consider whether supplemental aids and services would permit satisfactory education in the regular classroom." Greer, 950 F.2d at 696; see also L.H. v. Hamilton Cnty. Dep't of Educ., 900 F.3d 779, 792-93 (6th Cir. 2018) ("[T]he appropriate yardstick is whether the child, with appropriate supplemental aids and services, can make progress . . . in the regular education setting."). Placement must be determined at least annually, "based on the child's IEP," and "as close as possible to the child's home." 34 C.F.R. § 300.116(b). "Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled." 34 C.F.R. § 300.116(c). Consideration must be given "to any potential harmful effect on the child or on the quality of services that he or she needs." 34 C.F.R. § 300.116(d). A "child with a disability is not

removed from education in age-appropriate regular classrooms solely because of needed modifications in the general education curriculum." 34 C.F.R. § 300.116(e).

5.

Petitioners argue that FCSD has violated J.F.'s right to FAPE because GNETS was not the LRE upon its introduction as a placement in March 2018, and J.F.'s educational performance did not require GNETS restrictive placement after October 2018. The Court agrees. The evidence presented at the hearing shows that J.F.'s educational needs can be supported in an educational setting less restrictive than GNETS.

6.

The Court sympathizes with the teachers and staff at Dolvin who faced immense challenges during J.F.'s kindergarten year. At the time of placement, however, J.F. was making behavioral progress, and he has continued to do so in the GNETS setting, even though the placement began without the supports of the BIP, and without OT, SLP, or the recognition of his ADHD. Placement at GNETS, ostensibly based upon triangularization of data, was inappropriate because the goals were mastered, there was no evidence of actual trauma, and the assessment in the BASC-3 showed only normal behavior. There is no evidence that the "potential for harm" to J.F. was assessed or resolved, and as a result, J.F. has not received the academic or social aspects of his education. Moreover, mastery of new goals, at the zero-incident level or even two incidents a week for six weeks, was not a reasonable goal for J.F., nor should it have been considered new criteria for a move into a less restrictive setting. The Court concludes that J.F. was unnecessarily and prematurely placed in GNETS, and inappropriately continued in this restrictive placement since the October 2018 IEP meeting.

7.

This Court's conclusion that FAPE was denied is based on the claim regarding LRE. Petitioners also claim that FAPE was denied when Respondent failed to implement the IEP and failed to ensure meaningful parent participation. Regarding failure to implement the IEP, Petitioners argue that the IEP's behavioral goals were dictated by the BIP, including its red/green card system, which was followed at Dolvin but was abandoned without notice at GNETS when Mr. Jordan relied instead on the Jordan Bucks system. See L.J. v. Sch. Bd., 927 F.3d 1203, 1211 (11th Cir. 2019) (discussing a "second species of IDEA claim" that arises when schools "fail to meet their obligation to provide a free appropriate education by failing to implement the IEP *in practice*"). They also argue that the red/green card system was inappropriate in and of itself. Although this Court takes very seriously a district's responsibility to implement an IEP, the evidence does not support a conclusion that Mr. Jordan or others at GNETS completely disregarded the BIP that was in J.F.'s IEP. On the contrary, Mr. Jordan testified that he understood the BIP. He collected the data it required. The undersigned does not find that there was a failure to implement that resulted in violation of FAPE. See id. at 1214 ("[T]he focus in implementation cases should be on 'the proportion of services mandated to those actually provided, viewed in context of the goal and import of the specific service that was withheld.'").

8.

As for a violation related to meaningful parent participation, the Court also finds that the evidence is insufficient. The Court is mindful of the supreme importance of this aspect of the IDEA's protections. Parents are to be "members of any group that makes decisions on the educational placement of their child." 20 U.S.C. § 1414(e); 34 C.F.R. § 300.116(a)(1). The evidence here, however, is insufficient to show that the decision to place J.F. in GNETS was

made at the time, on the February 1, 2018, when the Consideration for Services Request was sent to GNETS. The Court finds that the decision was made by the IEP team at the March 2018 meeting—over J.A.'s objection, to be sure, but with her present as a member of the team. The undersigned does not find that evidence was sufficient to show that the rest of the team predetermined GNETS as the placement. Even if the February 2018 IEP meeting was held in a slapdash fashion, with last-minute notice to J.A., who had been invited to the school for a meeting and was only given the IEP invitation once she arrived, the Court does not find that there was sufficient evidence presented that prior to March 2018 the team had determined the placement.

9.

Based on the problematic determination of the LRE, the Court concludes that the District violated the IDEA, and thereafter, and Petitioners are entitled to appropriate compensatory relief. 20 U.S.C. § 1415(f)(3)(e)(ii)(II). See Cobb County Sch. Dist. v. A.V., 961 F. Supp. 2d 1252 (N.D. Ga. 2013). In determining the appropriate remedy, this Court has "broad discretion" to "fashion discretionary equitable relief." Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 15-16 (1993) (internal quotations and citations omitted); Draper v. Atlanta Indep. Sch. Sys., 518 F.3d 1275, 1285 (11th Cir. 2008) (quoting Sch. Comm. Of the Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 374 (1985)). The Court has determined that the appropriate relief is as follows:

- The IEP team shall create an IEP to transition J.F. back to the LRE, a FCSD co-taught setting.

- J.F. shall receive speech language therapy in accordance with the recommendations of Ms. Cohen's report.

- J.F. shall receive individual occupational therapy for two thirty-minute sessions per week, group occupational therapy for two thirty-minute sessions per week, one thirty-minute OT consult each week, and a sensory regulation program and social skills group, in accordance with Ms. Wing's report.

- J.F. shall receive eighteen months of individualized compensatory education services, designed by the IEP team and including Extended School Year, to close the achievement gap.[8]

- FCSD shall hold an IEP meeting to conform J.F's IEP to the terms of this Order.

10.

The complaint also alleges violations of rights under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act, which Petitioners state are included for the purpose of exhaustion of administrative remedies.  (See DPHR ¶¶ 49-51.) OSAH's jurisdiction in an IDEA due process hearing does not extend to causes of action that arise under other federal laws.  See Atlanta Indep. Sch. Sys. v. S.F., 2010 U.S. Dist. LEXIS 141552, *21-22 n.4 (N.D. Ga. February 22, 2010) ("There is nothing in the Georgia Administrative Code section applicable to IDEA dispute resolution that suggests that the impartial due process hearing is an appropriate venue for raising non-IDEA claims.") (citation omitted).  When a petitioner's claims under Section 504 or the ADA seek relief that is also available under the IDEA, federal law requires that the petitioner first exhaust the IDEA's administrative procedures.  See Durbrow v. Cobb Cty. Sch. Dist., 887 F.3d 1182, 1190 (11th Cir. 2018) ("Since the only remedy available under the IDEA is injunctive relief for the wrongful denial of a FAPE, any such claim must undergo an administrative hearing before proceeding to

---

[8] Eighteen months approximates the amount of time that J.F. was placed in GNETS over the course of the 2018-2019 and 2019-2020 school years.

state or federal court, whether the claim arises under the IDEA, § 504, the ADA, or any other federal law.") (citing <u>Fry v. Napoleon Cmty. Sch.</u>, 137 S.Ct. 743, 750 (2017); <u>see also</u> <u>M.T.V. v. DeKalb Cty. Sch. Dist.</u>, 446 F.3d 1153, 1158 (11th Cir. 2006) ("[T]he philosophy of the IDEA is that plaintiffs are required to utilize the elaborate administrative scheme established by the IDEA before resorting to the courts to challenge the actions of the local school authorities.") (citation omitted).  The exhaustion requirement does not expand OSAH's jurisdiction or confer authority on OSAH to resolve all legal claims between parties regardless of the origin of such claims.

## IV.    DECISION

As set forth herein, the Petitioners' request for relief is **GRANTED**.  Any other pending motions are **DENIED** as moot.

**SO ORDERED**, this the 21st day of January, 2020.

**Michael Malihi**
**Administrative Law Judge**