**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| FULTON COUNTY SCHOOL DISTRICT, <br><br> *Plaintiff,* <br><br> v. <br><br> J.F., by and through J.A., and J.A., <br><br> *Defendants*. | CIVIL ACTION <br> FILE NO. 1:20-cv-1675-ELR |

## ANSWER, DEFENSES AND COUNTERCLAIMS

### TABLE OF CONTENTS

**ANSWER, DEFENSES AND COUNTERCLAIMS** ............................................- 3 -

FIRST DEFENSE – DEFENDANTS PREVAILED BEFORE GEORGIA ADMINISTRATIVE COURT AFTER TRIAL BELOW AND THE FINAL DECISION IS GIVEN "DEFERENCE" IN THIS COURT ......................................- 3 -

SECOND DEFENSE –FAILURE TO STATE A CLAIM .........................................- 4 -

THIRD DEFENSE – "DEFERENCE" IS GIVEN TO THE FACT FINDINGS......- 4 -

AND CONCLUSIONS OF LAW ........................................................................- 4 -

FOURTH DEFENSE – ALJ FINDINGS ARE *PRIMA FACIE* CORRECT.............- 5 -

FIFTH DEFENSE -   DEFENDANT FAMILY BORE ITS BURDEN OF PROOF AND PLAINTIFF'S COMPLAINT FAILS TO ESTABLISH LEGAL ERROR .....- 6 -

SIXTH DEFENSE – PLAINTIFF HAS NOT ACTED IN GOOD FAITH AND SHOULD BE DENIED THIS COURT'S EQUITABLE RELIEF .............................- 6 -

SEVENTH DEFENSE – PLAINTIFF FAILED TO EXHAUST CLAIMS ..............- 6 -

EIGHTH DEFENSE – PLAINTIFF HAS WAIVED CLAIMS.................................- 7 -

NINTH DEFENSE- PLAINTIFF VIOLATED ITS OWN RULES AND THE RULES OF GNETS AND GDOE IN MAINTAINING DEFENDANT IN A SEGREGATED AND RESTRICTIVE PLACEMENT ........................................................................- 7 -

TENTH DEFENSE –PLAINTIFF FAILS TO ESTABLISH THE RIGHT TO ADDITIONAL EVIDENCE ..........................................................................- 7 -

ELEVENTH DEFENSE – PLAINTIFF FAILS TO ENUMERATE ACTUAL ERROR IN ALJ DECISION ............................................................................- 7 -

TWELVETH DEFENSE – PLAINTIFF'S VIOLATION OF SEC. 615 PREVENTS IT SECURING RELIEF IN THIS COURT ..................................................- 8 -

THIRTEENTH DEFENSE – COMITY AND ABSTENTION DENY PLAINTIFF THE RIGHT TO OVERTURN THE GEORGIA ALJ .............................- 8 -

FOURTEENTH DEFENSE – PLAINTIFF'S TRIAL ACTIONS WAIVED CLAIMS IT NOW PLEADS...........................................................................- 8 -

FIFTEENTH DEFENSE – PLAINTIFF IS BOUND BY OR ADMITTED ISSUES AND CLAIMS IT NOW SEEKS TO CHANGE OR CHALLENGE .....................- 9 -

SIXTEENTH DEFENSE - ANSWER TO EACH PARAGRAPH

RESPONSE TO ALLEGATIONS IN COMPLAINT .............Error! Bookmark not defined.

I.    INTRODUCTION .................................................................................- 9 -

II. JURISDICTION AND VENUE ................................................................- 13 -

III. PARTIES...........................................................................................- 13 -

IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES ...................................- 13 -

V. FACTUAL BACKGROUND....................................................................- 13 -

VII. CLAIMS FOR RELIEF..........................................................................43

A.   COUNT 1: IDEA ............................................................................43

B.   COUNT 2: Declaratory Judgment...........................................................43

PART II  -  COUNTERCLAIMS OF J.F. AND J.A ...........................................44

A.   DEFENDANTS' RESTATEMENT OF FACTS ......................................44

B.   STATUTORY AND LEGAL RIGHTS AFTER AN ALJ DECISION................44

C.   DEFENDANTS'/COUNTERCLAIM ADDITIONAL FACTS.........................46

COUNT I  -  FAILURE TO IMPLEMENT FINAL DECISION OF ALJ .................57

COUNT II  -  INTENTIONAL DISCRIMINATION IN VIOLATION OF .............59

THE AMERICANS WITH DISABILITIES ACT .......................................59

COUNT III  DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO THE AMERICANS WITH DISABILITIES ACT.................................................62

CERTIFICATE OF COMPLIANCE ...........................................................66

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| |
|---|
| FULTON COUNTY SCHOOL DISTRICT, |
| *Plaintiff*, |
| v. |
| J.F., by and through J.A., and J.A., |
| *Defendants*. |

CIVIL ACTION
FILE NO. 1:20-cv-1675-ELR

## ANSWER, DEFENSES AND COUNTERCLAIMS TO AMENDED COMPLAINT

COME NOW Defendants, having won that J.F. was illegally placed in a segregated GNETS program in Fulton County, without appropriate services, pursuant to Fed. R. Civ. P. 8 and 12 respond to the allegations in Plaintiff's Complaint, stating applicable defenses and counterclaims known at this time:

## FIRST DEFENSE – DEFENDANTS PREVAILED BEFORE GEORGIA ADMINISTRATIVE COURT AFTER TRIAL BELOW AND THE FINAL DECISION IS GIVEN "DEFERENCE" IN THIS COURT

Defendant J.F. is a school-aged student with a disability under IDEA, 20 U.S.C. §§ 1400 *et. seq.*, with the right to a free and appropriate public education ("FAPE"). He and his parent J.A. have exhausted administrative remedies and substantially prevailed in an administrative hearing before the Georgia Office of State Administrative Hearings (OSAH) against Plaintiff Fulton County School

District (FCSD or Fulton). The Georgia ALJ's Final Decision, (Final Decision, Amended Com. Exh. A) including the fact findings adverse to Plaintiff, are based on credibility determinations from observing the witnesses, weighing their testimony and contentions, comparing it to the documentary evidence and other testimony, and the credible rejection of contentions pled here in the Complaint or argued below. Accordingly, the judgment of the State of Georgia, through its Administrative Hearing Officer (ALJ), should be given significant "deference" and affirmed as to Plaintiff FCSD's failure to provide a "free appropriate public education" ("FAPE"), and having violated the placement provisions most particularly the failure to allow the "Least Restrictive Environment" ("LRE)" and its other evaluation and instructional failures contrary to federal and state law. See, e.g., Walker County Sch. Dist. v. Bennett ex rel. Bennett, 203 F.3d 1293 (11th Cir.2000); CP v. Leon County Sch. Bd. Fla.,483 F.3d 1151, 1155 (11th Cir.2007) (citing Sch. Bd. v. K.C.,285 F.3d 977, 982-83 (11th Cir. 2002); Loren F. v. AISS, 49 F.3d 1309, 1314 (11th Cir. 2003).

## SECOND DEFENSE –FAILURE TO STATE A CLAIM

Plaintiff has failed to state a claim for which relief can be granted and therefore its claims should be dismissed or rejected while Defendants receive all appropriate relief. It continues to use "shotgun pleadings."

## THIRD DEFENSE – "DEFERENCE" IS GIVEN TO THE FACT FINDINGS AND CONCLUSIONS OF LAW

The Georgia Chief ALJ's findings after trial is entitled to deference. Plaintiff agency fully litigated the claims, called 11 lay and expert witnesses, had full access to documents under IDEA and state law, issued subpoenas, cross-examined all witnesses and established <u>and</u> preserved no evidentiary or legal error. Plaintiff presents no basis for piercing "deference" or overturning the well constructed findings and conclusions of the Georgia ALJ. Plaintiffs should take nothing sought in its Complaint and Defendants awarded all relief the Court determines appropriate under 20 U.S.C. § 1415(i)(2)(C)(2004).

### <u>FOURTH DEFENSE</u> – ALJ FINDINGS ARE *PRIMA FACIE* CORRECT

The Final Decision of the Georgia ALJ was based on the issues Defendants pled, the evidence presented and the claims argued and should be affirmed. Alternatively, the construction by Georgia through the ALJ of its own regulations, rules and procedures which do not interfere in the provision of FAPE, or limit any rights of a disabled student under federal law, are entitled to deference and/or full faith and credit. Findings of the Georgia ALJ are *prima facie* correct, e.g. <u>Loren F. v. AISS,</u> 49 F.3d 1309, 1314 (11th Cir. 2003)(citing cases), and the Complaint fails to pierce such findings. Therefore, the relief sought by FCSD against this disabled student should be denied and J.F. and J.A. awarded "all appropriate relief." 20 U.S.C. § 1415(i)((2)(c)(iii)(2004); <u>see</u> <u>AISS v. Draper</u>, 518 F.3d 1275 (11th Cir. 2008).

## FIFTH DEFENSE - DEFENDANT FAMILY BORE ITS BURDEN OF PROOF AND PLAINTIFF'S COMPLAINT FAILS TO ESTABLISH LEGAL ERROR

Defendants bore their burden of proof at trial. See Schaffer v. Weast, 546 U.S. 49 (2005). On appeal, FCSD has the burden of pleading and of proof, id., and has failed to establish in its Complaint/Appeal any legal error in the handling of the evidence and hearing, nor any in the OSAH ALJ's construction of the law.

## SIXTH DEFENSE – PLAINTIFF HAS NOT ACTED IN GOOD FAITH AND SHOULD BE DENIED THIS COURT'S EQUITABLE RELIEF

Plaintiff has not acted in good faith, and has failed to timely and in good faith provide the "maintenance of placement," 20 U.S.C. § 1415(j)(2004); 34 C.F.R. § 300.518, since the entry of the Final Decision, violating Defendants' IDEA rights since the Final Decision of January 21, 2020. In the absence of good faith and compliance with IDEA, FCSD is without "clean hands," and therefore is not entitled to any relief from this Court under IDEA.

## SEVENTH DEFENSE – PLAINTIFF FAILED TO EXHAUST CLAIMS

FCSD seeks to raise issues not pled or presented to the Administrative Court, failing to exhaust administrative remedies. This Court is without authority and/or without subject matter jurisdiction over such issues or claims, such claims have been waived and not exhausted below and/or this Court should strike or disregard any such arguments or claims. E.g., M.T.V. v. DeKalb County Sch. Dist., et al., 446 F.3d 1153, 1157-59 (11th Cir. 2006).

## EIGHTH DEFENSE – PLAINTIFF HAS WAIVED CLAIMS

FCSD's Complaint is barred by the doctrines of waiver and estoppel. Elements of FCSD's Complaint are barred by judicial admissions contrary to its allegations and should be denied based on the actual record and testimony.

## NINTH DEFENSE- PLAINTIFF VIOLATED ITS OWN RULES AND THE RULES OF GNETS AND GDOE IN MAINTAINING DEFENDANT IN A SEGREGATED AND RESTRICTIVE PLACEMENT

Plaintiff violated its own procedures and the procedures of the GNETS, failed to have an adequate "continuum of services" and allowed the GNETS to disregard its own rules, state law, state regulations and procedural manuals and directives. These actions were *ultra vires* and/or violated IDEA and IDEA placement obligations, and FCSD should not be permitted to seek relief in breach of such procedures and rules, and additionally, it cannot establish a *prima facie* case it complied with such provisions or protected the rights of the Family.

## TENTH DEFENSE –PLAINTIFF FAILS TO ESTABLISH THE RIGHT TO ADDITIONAL EVIDENCE

Plaintiff having fully tried its case, does not establish a right to seek or secure additional evidence on the merits of the claims. See Walker County Sch. Dist. v. Bennett ex rel. Bennett, 203 F.3d 1293 (11th Cir. 2000).

## ELEVENTH DEFENSE – PLAINTIFF FAILS TO ENUMERATE ACTUAL ERROR IN ALJ DECISION

Plaintiff fails to establish enumeration of errors which describe the actual error it contends was made by the ALJ in the Final Decision, and fails to provide

the basis upon which it claims error or erroneous findings of fact or erroneous legal conclusions by the ALJ. The allegations of error are so vague and ambiguous that Defendants cannot reasonably prepare a response and its Complaint fails to meet the requirements of Fed. R. Civ. P. 8(a), 10 and 12(e).

## TWELVETH DEFENSE – PLAINTIFF'S VIOLATION OF SEC. 615 PREVENTS IT SECURING RELIEF IN THIS COURT

FCSD violated Section 615 of IDEA, *inter alia* denying it the right to relief.

## THIRTEENTH DEFENSE – COMITY AND ABSTENTION DENY PLAINTIFF THE RIGHT TO OVERTURN THE GEORGIA ALJ

The relief sought by Plaintiff as a local educational agency (LEA), to overturn an adverse determination of the Chief OSAH ALJ and the State of Georgia fails based on the weighing of the evidence and the construction and application of state law, is entitled to great weight and should be denied in the interests of comity and abstention.

## FOURTEENTH DEFENSE – PLAINTIFF'S TRIAL ACTIONS WAIVED CLAIMS IT NOW PLEADS

Plaintiff failed to contest or rebut material portions of its failure to provide FAPE in the LRE and cannot now contest or rebut such failures, nor has it exhausted many contentions including the ALJ ordered Occupational Therapy, Speech and Language Therapy, Jamir as a child with ADHD, J.F.s' mastery of his IDEA goals and objectives in October of 2018, and J.F.'s absence of need under the GNET's placement triangularization criteria, and other issues. Such factors

are not in dispute and cannot now be contested, and demonstrate the denial of

FAPE and denial of services and supports to maintain and provide the LRE.

### FIFTEENTH DEFENSE – PLAINTIFF IS BOUND BY OR ADMITTED ISSUES AND CLAIMS IT NOW SEEKS TO CHANGE OR CHALLENGE

FCSD pled or pursued contentions in the administrative court which are

contrary to its allegations in this Court, and it waived or is barred from now

contending to the contrary, or has failed to exhaust such contentions.

### SIXTEENTH DEFENSE - ANSWER TO EACH PARAGRAPH

In answer to the enumerated paragraphs of the Complaint, Defendants

state that the Final Decision of the Georgia Administrative Law Judge concluded

that Plaintiff violated federal and state law on multiple grounds, and in

Defendants' more specific response to each enumerated paragraph of the

Complaint, they state as follows:

## I.    INTRODUCTION

1.      Admit that Plaintiff is "aggrieved" having lost in a full and fair trial before

the Georgia OSAH, and that it claims error, and further admit that

administrative rules and IDEA provide for this appeal. Ex. 1 as a document

speaks for itself, but is a true copy of the Final Decision it must challenge.

2.      Admit that FCSD is entitled to *de novo* review but only as defined by IDEA,

20 U.S.C. § 1415(i) and the binding rules of the United States Supreme Court and

the Eleventh Circuit Court of Appeals and deny the remainder of paragraph 2.

3.    Admit.

4.    Admit but Ex. 2 as a document speaks for itself and was the Defendants'

initial administrative complaint.  In response to footnote 1, Defendants agree that

they pled ADA/Section 504, and Section 1983 claims in their administrative

complaint and raised the question of the Administrative Court's jurisdiction over

such claims, and that the Georgia ALJ ruled that OSAH through GDOE did <u>not</u>

have jurisdiction of any other federal claims but for those arising under IDEA

pursuant to Section 615 (1415). Defendants admit that they raised such claims in

part to exhaust their administrative remedies under 20 U.S.C. § 1415(l)(2004), and

that the Final Decision, Doc. 1-1, Compl. Ex. 1, held that was done.[1]

5.    Admit.

6.    Defendants admit they raised the allegations upon which they prevailed

that *inter alia* J.F. had not been timely or adequately evaluated in occupational

therapy ("OT") and speech and language therapy ("SLP"), including at ¶¶ 64-66

of the Complaint.[2]

---

[1] Plaintiff plead a number of footnotes in its Complaint. Defendants are not told whether these are substantive allegations and these normally do not require answer under Fed. R. Civ. P. 8 and 10, but where answer is required, these are denied. Additionally, Defendants, Petitioners below, may herein by direct reference answer and/or correct some of these notes, as many are misleading or require a contextual response.

[2] 20 U.S.C. § 1415(b)(7)(A) and (c)(2)(A) have certain stepped down administrative pleading obligations for the petitioning family. Under IDEA petitioners state "facts" which support "problems" they identify. Plaintiff FCSD here cites 3 referenced paragraphs citing to "facts" of the Complaint, but does

7.      Denied.  Defendant's Count 4 in their due process request includes paragraphs 79 to 85.  Defendant's allegations speak for themselves and are broader in scope in Defendant's own pleading than as paraphrased by Plaintiff.

8.      Denied.  Defendant's Statement of the Current Resolution as stated in Defendants' due process request speaks for itself.  Defendants' request for "resolution" on pages 24-27 of Defendants' own Complaint are broader in scope and encompass a more comprehensive remedy than as paraphrased by Plaintiff.

9.      Denied.  Defendants' admit FCSD filed a "Response to Due Process Hearing Request" on December 27, 2019.  The referenced document speaks for itself, including Plaintiff's unsubstantiated and wrongheaded claim that Defendants' twenty-eight page due process request with eighty-five paragraphs alleging denial of FAPE and LRE to J.F., was, "a thinly veiled attempt to attack services provided through the GNETs program in general, in an effort to bolster a separate and wholly unrelated litigation that seeks to deny disabled students these services *in toto* and that is entirely divorced from the individualized analysis necessary and required for any IDEA proceeding." Id. This allegation was made wantonly without a basis in fact and abandoned at trial when

_____

not cite to ¶¶ 14, 46, 47, 57 (failure to evaluate in OT and SLP), and 77, all of which further address these areas. Petitioners in answering this Complaint will admit or deny the pled references but do not agree this reference or others are complete or exclusive of all pertinent allegations and statements. Defendants as petitioners below pled what IDEA calls a "sufficient" administrative complaint. See 20 U.S.C. §§ 1415(b) (7)(A), 1415(c)(2)(A) and (B)(i)(II)(2004).

unsupported by evidence or further argument. The facts of this case may illustrate the inadequacy of GNETS programs but the case was to protect J.F.

10.     Denied.  Defendants admit that OSAH held an administrative hearing. The hearing was originally scheduled for May 2019 but did not begin to allow the parties to attempt mediation.  When mediation failed, the hearing began on September 4, 2019.  On September 5, 2019 counsel for Plaintiff notified the Court of an emergency as the trial was set to resume, and the hearing was postponed until September 24-27 causing Defendants' to incur additional expense and expend additional time. Defendants further state that evidence presented by Plaintiff in support of its position was rejected by the ALJ who ultimately found that Plaintiff's denied J.F. FAPE and the LRE during all applicable time periods.

11.     Admit.  Defendants further state that the Chief Administrative Law Judge's "Final Decision," Doc 1-1, speaks for itself.

12.     Admit.  Defendants further state that the Chief Administrative Law Judge's "Final Decision," Doc 1-1, speaks for itself.

13.     Denied. Defendants further state that paragraph 13 is a legal conclusion in violation of Fed. R. Civ. P. 8 and 10. Defendants further object to paragraph 13 as insufficient to formulate a response and in need of more definite statement.

14.      Denied. Defendants further state that paragraph 14 is a legal conclusion in violation of Fed. R. Civ. P. 8 and 10. Defendants further object to paragraph 14 as insufficient to formulate a response and in need of more definite statement.

## "II. JURISDICTION AND VENUE"

15.     Admitted.

16.     Admitted.

17.     Admitted.

## "III. PARTIES"

18.     Admitted.

19.     Admitted.

## "IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES"

20.     Admitted.

21.     Admitted that FCSD seeks review and declaratory relief, denied that it is entitled to any relief.

## "V. FACTUAL BACKGROUND"

22.     Admitted.  Defendants further state that New Prospect is the location of an elementary school in the FCSD as well as a location of a few classes of the Georgia Network for Educational Therapeutic Services (GNETS) in the North Metro configuration, a segregated program for students with disabilities operated and managed by the state of Georgia, and subject of two separate pieces of statewide litigation, - U.S. v. GA, Case No. 1:16-cv-03088-ELR and GAO et al. v. Georgia, Case No. 1:17-cv-03999 - MLB.

23.     Denied.  Defendants state that J.F.'s eligibility for special education services, as determined at a February 25, 2020 individualized educational

planning meeting (February 2020 IEP) includes SDD, a catchall designation for students under the age of nine in Georgia[3], as well as Speech/Language Impaired[4] and Other Health Impaired[5].

24.     Denied.  Pursuant to the Final Decision, J.F.'s current educational placement is no longer the GNETS, but a co-taught classroom now located with FCSD's New Prospect E.S. general education classes. See 34 C.F.R. § 300.518(d).

25.     Denied.  As determined by the ALJ in the Final Decision, and as confirmed at the IEP meeting on Feb. 25, 2020, even by FCSD's own staff, J.F.'s behavior does not include regular acts of severe aggression, does not include property destruction, or physical attacks on adults or students.  Defendants deny that J.F.'s current educational performance includes such regular acts.  Defendants deny that the individualized attention and interventions included in the February IEP are to address the problems stated in paragraph 25.

26.     Admitted.

**"B.     Background on how J.F. came to be in GNETS at New Prospect**

**     i.   J.F. loses his hardship waiver at River Eves Elementary School as a result of severe behavior problems"[6]**

---

[3] Ga. Conf. r. & reg. 160-4-7-.05-16 (Appendix H-SDD).
[4] Ga. Conf. r. & reg. 160-4-7-.05-21 (Appendix J-SLD).
[5] Ga. Conf. r. & reg. 160-4-7-.05-14 (Appendix G-OHI).
[6] Plaintiff uses various headings in bold but which are argumentative and often erroneous. Defendants are not clear that these are *allegations* in the Amended Complaint, but to the extent any action is required, these are denied and Defendants seek that they be disregarded. Defendants set out some of these out

27.     Admitted.  Defendants deny footnote 2 on page 8.  Defendants state that J.A. was not provided any notice of the conditional factors of hardship transfer enrollment, including that behavior that is determined "satisfactory" by some standard or measure other than the goals and objectives in J.F.'s IEP.

28.     Denied. Upon registration, and again when enrolled, J.A. repeatedly gave Plaintiff's notice, verbally and in writing, that J.F. required behavioral supports in an educational environment.

29.     Denied. Plaintiff did not provide any appropriate behavioral supports for J.F. in a timely fashion, nor upon or right after enrollment.  J.F. was repeatedly subjected to physical restraint and seclusion as Plaintiff's failed to timely assess the functions of J.F.'s behaviors or create appropriate interventions for Jamir.

30.     Denied.  Defendants state that J.F.'s hardship transfer was revoked without any prior notice of Plaintiff's hardship policy or explanation of how enforcement of such policy against a student with a disability that requires unique and individualized instruction constitutes an appropriate accommodation of the student's disability.

31.     Denied.  J.A. provided educational instruction at home during this time as J.F. was not yet six years old, the Family was in the process of moving into Fulton

---

which purport to assert allegations or argument, and leave out some which appear to just add structure. Defendants add quotations to identify them.

County and another school zone, and J.F. was not subject to the compulsory

education laws that require a student must attend school.

> **"ii.     After losing his hardship waiver, J.F. is enrolled at Dolvin Elementary School and   immediately begins exhibiting problem behaviors requiring a special crisis protocol."**

32.      Admitted.  Defendants deny the statement in footnote 3.

33.      Denied.  Defendants admit that an SST meeting was held on October 2,

2017. Defendants deny the remainder of paragraph 33.

34.      Denied.

35.      Denied. Defendants state there is no temporal limitation to this allegation

and therefore Defendants are without sufficient information to respond.

Defendants admit J.F. engaged in behaviors related to his disability while at

Dolvin Elementary School (Dolvin).  Defendants further state that J.F.'s behaviors

were aggravated by the methods of intervention employed by the staff at Dolvin,

including the use of illegal physical restraints and illegal seclusion of J.F as a

form of behavior management, and by the lack of appropriate behavioral

interventions or expertise.  Defendants deny the remainder of paragraph 35.

36.      Denied.  Defendants state there is no temporal limitation to this allegation

and therefore Defendants are without sufficient information to respond.

Defendants respond and state that J.F., a five-year old student with an

undiagnosed speech/language disorder and sensory integration disorder,

experienced behaviors while at Dolvin in response to his inability to process both

receptive and expressive language, and as a consequence of his extreme sensory dysregulation. J.F.'s behaviors were not directed at any particular person, but rather a "fight" and/or "flight" response to the over-stimulation of his inappropriate educational environment as well as the repeated physical restraints being used by Dolvin staff, as was established at trial. FCSD ignored this for two years and was only explained by J.F. at trial.

37.     Denied. Defendants state there is no temporal limitation to this allegation and therefore Defendants are without sufficient information to respond. Defendants state that there were what FCSD called elopements, but J.F.'s elopements were in response to his inability to process both receptive and expressive language, and as a consequence of his extreme sensory dysregulation caused by the inappropriate program at Dolvin, as well as an unremediated "flight or fight" response, all increased by J.F.'s unremediated needs.

38.     Denied. Defendants state there is no temporal limitation to this allegation and therefore Defendants are without sufficient information to respond. Defendants further state the failure to provide special education services to a student with a disability rendered the instruction inappropriate. Thus, J.F. was not provided appropriate instruction, and received an inappropriate educational program, both a result of the Plaintiff's failure to adequately evaluate J.F., and these had the consequence of Dolvin administrators being called by staff to

provide inappropriate and damaging interventions, uninformed by timely assessment and expertise. These were not informed by adequate evaluations.

39.     Denied.  Defendants incorporate by express reference the response to paragraph 38.

40.     Denied.  Defendants incorporate by express reference the response to paragraph 38.

41.     Denied.  Defendants incorporate by express reference the response to paragraph 38, including specifically that these interventions and actions were uninformed by appropriate assessment and expertise and not designed to meet the situation or needs.

### iii.   "Within J.F.'s first month at Dolvin, FCSD timely evaluates J.F., determines him eligible for special education services, and begins the IEP process."[7]

42.     Denied as stated.  Defendants state that J.F. enrolled in FCSD in August 2017, and J.F.'s mother J.A. requested a full comprehensive evaluation on August 28, 2017 when J.F. began school at River Eves Elementary School.  Defendants deny the characterization of J.F.'s behavior during the Innes evaluation. Defendants respond that the FCSD Evaluation dated October 10, 12, speaks for itself.  Defendants further deny all remaining allegations in ¶42.

---

[7] This heading is expressly denied.

43.    Admitted that Kaplan conducted a speech/language evaluation.

Defendants deny that the evaluation was compliant with IDEA or that the results

of the evaluation reflected J.F.'s actual speech/language deficits, even as later

identified by Ms. Mindy Cohen, the independent speech/language evaluator.

Defendants state further the evaluation report is a document that speaks for

itself.  Defendants deny the allegations in footnote 4 and state that the findings of

the Kaplan speech/language evaluation were contradicted by Ms. Cohen and

rejected in the ALJ Final Decision, and only identify a small part of J.F.'s needs,

breaching his right under IDEA to a full and appropriate evaluation in all areas

of needs.  See 34 C.F.R. § 300.304. See discussion, Doc. 1-1 (Final Decision) at 15-

16. Such evaluation led to inadequate services and masked the language

impairment's role in attention and behavior, all corrected by the Final Decision.

44.    Denied as stated.  Defendants admit there was a meeting held on October

27, 2017 but it was an Eligibility/IEP meeting under IDEA with procedural and

substantive requirements FCSD was obligated to follow.   Defendants admit J.F.

was made eligible for special education via the SDD category of eligibility.

Defendants deny that the IEP Team made any consensus decisions about J.F.'s

need for speech services and state that J.F.'s mother, J.A., disagreed with the

decision of the school members of the IEP Team regarding J.F.'s need for such

services.  Defendants admit the reference made to "significant developmental

delay" used in footnote 5 and admit that the federal definition for SDD is located at 34 C.F.R. §300.8. Defendants deny any remaining language in footnote 5.

45. Denied. Defendants state that the initial placement for J.F., as well as the supplemental services, modifications, accommodations and special education instruction it allowed are included in the IEP document which speaks for itself. Defendants deny that J.F. received appropriate behavioral supports at Dolvin. Defendants deny that the IEP Team by consensus made these decisions and state that J.F.'s mother, J.A., disagreed with the decision of the school members of the IEP Team regarding J.F.'s placement and the appropriateness of services. Defendants deny that J.A.'s statement that J.F. would receive an occupational therapy evaluation in November contained in the IEP document accurately reflects the events of that meeting, and further deny that any such evaluation negates the District's obligations to appropriately and timely conduct evaluations in all areas of suspected need, as J.A. had requested in August 2017. Defendants admit that at the time of this meeting IDEA's mandate of a 60-day limitation from request through evaluation to IEP meeting to protect the child, had or was soon to expire, see 34 C.F.R. § 300.301, and further admit that Kimberly Wing later conducted an independent occupational therapy evaluation following Defendants disagreement with the OT evaluation conducted by the Plaintiff.

     **iv. "Within two months of J.F. enrolling at Dolvin, FCSD conducts an FBA, develops a BIP, and engages two outside behavioral specialists**

**to help address his behaviors."**

46.     Defendants are without sufficient information to admit or deny the description of functional behavioral assessments provided in paragraph 46. Defendants deny the remainder of paragraph 46, and further the source of the quotation marks used is not identified or stated and therefore cannot be admitted or denied. Defendants admit that some professionals adhere to the three general categories of FBAs stated but deny the rest of these allegations including generic phrases such as "typically" as such are undefined and too vague for response.

47.     Denied.  Defendants admit that Ms. Halbert completed a report she titled Functional Behavioral Assessment.  Defendants state that the report speaks for itself and is part of the administrative record.  Defendants deny the procedural or substantive appropriateness of the Halbert FBA or the accuracy of the report and cannot admit or deny the accuracy of quoted statements as the source of such material is not stated.[8]

48.     Denied.  Defendants state Plaintiff created a document titled Behavior Intervention Plan (BIP) that is part of the administrative record and speaks for itself.  Defendants deny that Dr. Alexander is an "independent BCBA" and are

---

[8] Footnote 7 is vague but assuming that it references the independent IEE OT evaluation credited by the Court by Ms. Wing, an expert called by J.F. at trial, this report is in evidence and was provided to FCSD many times and therefore the footnote is denied.

without knowledge to admit or deny the remainder of this paragraph, though Alexander did testify at trial and identified herself as owner of CBC.

49.    Denied.  Defendants state that Southern Behavioral Group was engaged as a result of Defendants' exercise of their rights to an independent educational evaluation pursuant to 34 C.F.R. § 300.502.  Defendants disagreed with the FBA conducted by Plaintiff and selected SBG to perform an FBA to provide the IEP Team with more accurate and complete information about J.F.'s behavior.

50.    Denied as stated but it is admitted that Dr. Alexander's first days of work concerning J.F. were in December 2017. It is denied this was appropriate and shown this was not based on an adequate FBA.  Defendants state that prior to Plaintiff bringing in Dr. Alexander, no appropriate behavioral services were provided and the BIP created in November 2017 failed to meet J.F.'s needs.

51.    Denied as Defendants are without sufficient information to admit or deny the allegations of modifications of the BIP as there is no explanation of what "normal", "adjusted" or "over time" means.  Defendants deny that Dr. Alexander completed her training of Dolvin staff, as FCSD did not allow training and implementation to impact its attempt to remove J.F., as Alexander started in December and J.F. was being recommended for removal from Dolvin Elementary as early as January 2018.  Defendants deny the remainder of paragraph 51.

   v.    **"FCSD progresses through the continuum of services, amends J.F.'s BIP, and conducts an OT evaluation."**

52.    Denied as stated.  Defendants state that J.F.'s first IEP, dated October 27, 2017, speaks for itself.  Defendants deny the description of co-teaching in footnote 9.  Defendants deny the remainder of paragraph 52, including all of footnote 10 as they were unable to assess the educational needs of unidentified "other students".  Defendants state that J.F.'s educational needs were not met by the staff at Dolvin and not appropriately supported in his IEP.  Further the inappropriate interventions administered by Dolvin educators escalated the disruptions in the classroom, increased J.F.'s time out of the classroom, and resulted in J.F.'s diminished work production.  To the extent that Plaintiff here admits that J.F.'s work production increased in the co-taught setting, a placement he only was allowed to stay in for a very short period of time, Defendants state that such progress renders its move of J.F. to a more restrictive placement illegal as in violation of IDEA's least restrictive environment guarantee.

53.    Denied.  Defendants admit J.F.'s IEP, is dated November 17, 2017, but it speaks for itself.  Defendants deny that the "IEP team" reached any conclusions as the parent, a member of the IEP Team, disagreed with the recommendation to move J.F. to a more restrictive placement.[9]  Defendants again deny that the

_____

[9] See 34 C.F.R. § 300.321(a)(1)-(7) (2006), defining the members of the IEP Team to include the parent. Theses allegations that what FCSD said and did alone and in disagreement with the parent, was nevertheless a decision of the IEP Team is simply an identification that FCSD fails to understand the IEP process or the importance of the parent. It demanded provisions of the IEP without consensus.

educational plan developed for J.F. at the November IEP meeting was appropriate or provided necessary behavioral supports. Defendants state further that the Plaintiff's decision to move J.F. to a more restrictive placement came shortly after this initial IEP, with a plan which was not implemented for a duration sufficient to determine its effectiveness or to support a change in the placement. Defendants deny the remainder of allegations in paragraph 53.

54.     Denied as stated. Defendants state that J.F.'s IEP, dated January 12, 2018, speaks for itself. To the extent that Plaintiffs admit that J.F.'s work production increased from 15% to 25% (5 out of 20 minutes), Defendants state that such progress in relatively few instruction days and without appropriate services and supports, renders J.F.'s move to a more restrictive placement improper and in violation of IDEA's least restrictive environment guarantee. Defendants deny that J.F.'s change in placement accords to his educational performance.

55.     Denied as stated. It is admitted that the IEP Team reviewed an OT document which Plaintiff states were OT observations whereas IDEA required an evaluation be conducted by FCSD, not merely observations. Evaluations under IDEA must meet specific procedural and substantive requirements[10], and when a parent disagrees with the reported findings of the District's

---

[10] See e.g., 34 C.F.R. § 300.301-300.305 (2006).

"assessments," as Defendants did in this case, parents are entitled to obtain an independent educational evaluation (IEE) pursuant to 34 C.F.R. §300.502(b).

56.     Denied as stated.  The BIP for J.F. was developed by Dr. Jennifer Alexander pursuant to a contract between Comprehensive Behavior Change (CBC) and FCSD, in advance of the meeting.  Defendants state the BIP was recommended to the Team by Dr. Alexander at the January 2018 IEP meeting

**vi.  "As the IEP team progresses through the continuum of services, it begins considering a more restrictive GNETS placement."[11]**

57.     Denied.  Defendants state that J.F.'s behavior continued to improve from November 2017 to January 2018, as he settled in a new school as a five (5) year old and even adjusted to some of the inappropriate interventions and actions. J.F.'s behaviors and the reaction caused school disruptions, however, the frequency of any disruptions declined between December 2017 and January 2018. The BIP included in the January 2018 IEP, implemented for only a very short time before Defendants recommended a GNETS placement, speaks for itself.

58.     Denied.  To the extent that Plaintiff describes any consistent process for de-escalation, Defendants deny that Plaintiff used any consistent, uniform process of interventions when J.F. was in the calm-down room.  Defendants further state that the process described in paragraph 58, and the behavior attributed to J.F., is contrary to the data collected by FCSD and this allegation demonstrates the

_____

[11] The accuracy and any inferences from this are denied.

inappropriateness of the FCSD response. Further, Defendants state that J.F.'s undiagnosed sensory integration disorder and speech/language disorder caused this very young child to have a "fight or flight" response, that resulted in repeated and indiscriminate flailing of arms and legs, and at times flight, rather than intentionally aggressive "swinging at staff" as described in paragraph 58.

59.     Denied. Defendants state that while in "fight or flight" response, which did not occur more than a few times per day, J.F. would flail his arms and legs, which the Defendants mischaracterized as <u>thousands</u> of problem behaviors. Defendants state that because of Defendants ineffective and inappropriate instruction and intervention, J.F. could be triggered back into "fight or flight" after transitioning back to class. Defendants deny the statement in footnote 11.

60.     Denied. Defendants state that they are without information to admit or deny whether every other student on Ms. Polaski's class roster did not have their instructional needs met by Ms. Polaski. Defendants state that from December 2017 to January 2018, the data reflected that J.F.'s behavioral outbursts had decreased and the frequency of the episodes were less than October and November 2017.

61.     Denied. Defendants state that J.F.'s IEP, dated February 20, 2018, speaks for itself. Defendants deny that J.A., a member of the IEP Team, agreed with the stated concerns of the school members of the team. Defendants state further that J.F. had made behavioral progress from December 2017 to February 2018, despite

the continuously inappropriate interventions of the staff at Dolvin. Defendants state that the BIP by CBC's Dr. Alexander had succeeded in reducing behaviors, and despite the data showing progress, that FCSD had already made a decision that GNETS was going to be the educational placement for J.F., regardless of the data and in the absence of any need to prevent residential placement. Defendants deny the statement in footnote 12 and state that a formal IEP referral could not have been made according to GNETS and Defendants procedures without the completion of the referral process that was initiated nineteen days before the February 2018 IEP meeting, that is on February 1, 2018.

62.     Denied.  Defendants further state that the entire administrative regulation regarding the GNETS program promulgated by the Georgia Board of Education, and *_quoted only in part_* by Plaintiffs, speaks for itself.  Defendants further state that GNETS, as defined by the State of Georgia, is a separate and segregated program that is directly funded by the state and administered and managed by the state.  The regulation partially quoted by Plaintiff fails to identify that GNETS maintains separate schools at stand-alone locations, as well as separate schools within school buildings owned by the local educational agencies (such as the GNETS Program at New Prospect that is the program at issue in this case).  The services provided by the GNETS program in this case were exclusively available outside of the traditional educational environment and separate from any non-disabled students.  Defendants further state that the description of services from

the quoted regulation in paragraph 62 were not provided to J.F., and that before being removed to the GNETS, J.F. did not exhibit the conditions required for any such GNETS placement.

63.     Denied.  See response to paragraph 62, incorporated herein.

64.     Denied.  See response to paragraph 62, incorporated herein.

65.     Denied.  Defendants state that at the time of J.F's GNETS referral in 2018, GNETS services were provided solely in GNETS locations.  Defendants state further that J.F. received no additional services in the GNETS than at Dolvin Elementary and some services were diluted and altered.  J.F. did not receive speech therapy, occupational therapy, IEP counseling services or intensive reading instruction in either setting at any time before the lawsuit.  Defendants state further that GNETS does not require any additional certifications, licenses, or training for a teacher to become a GNETS teacher.  Defendants also state that the de-escalation trainings provided to GNETS teachers does not exist exclusively at GNETS and other educators in non-GNETS schools can receive the same or even more intensive de-escalation training. Prior to the GNETS, J.F. received direct BCBA services, at the GNETS the BCBA simply reviewed data.

66.     Denied.  The incomplete GNETS referral packet submitted by Abernathy on February 1, 2018 speaks for itself.  Defendants deny that Plaintiff's referral of J.F. to GNETS was conditional or tentative.  Defendants state that GNETS admission procedures require the school to state their position that a student

*requires GNETS services*, and the GNETS program makes the decision whether

placement is to be made, all outside of the IEP and without input from families.

67.     Denied.  Defendants state the GNETS referral process is proscribed by

state regulations and the GNETS Manual which speak for themselves and were

examined in the hearing below.  Defendants deny that the process is consistently

followed by Plaintiff or by GNETS or that Plaintiff and GNETS followed that

process, or that the outcome of that process constitutes a legitimate decision

about the educational needs of J.F., or any student.  GNETS procedures are

separate and distinct from the procedural protections required by IDEA or

504/ADA or supporting regulations, and reliance on GNETS procedures does

not necessarily satisfy IDEA's guarantee of free, appropriate public education or

that a student will be properly be placed in the least restrictive environment.

68.     Denied.  See response to paragraph 65, incorporated herein.

69.     Denied.  See response to paragraph 65, incorporated herein.

70.     Denied.  The March 2, 2018 BIP is a document that speaks for itself.

Defendants state that Dr. Alexander's changes to the BIP from January to March

2018 were indicative of the progress made by J.F. and the reduction in the

frequency and intensity of behavioral episodes J.F. experienced, as she testified.

Defendants further state that these changes to the BIP reflective of J.F.'s progress

caused spikes in J.F.'s behavior as her adjusted to the new parts of the BIP which

required new behaviors, and these spikes in behavior caused by the new BIPs were erroneous used by FCSD to justify J.F.'s segregated placement at GNETS.

71.    Denied.  The March 12, 2018 OT report is a document that speaks for itself. Defendants further state that the evaluation conducted by Allison Bartleson failed to meet the procedural or substantive requirements for evaluations under IDEA and was not valid, as was demonstrated on cross-examination.  Footnote 13 is denied and it is stated that the evaluation results were inconsistent with the findings of the independent educational evaluation of Ms. Kimberlee Wing, who determined that J.F. suffered significant weaknesses in fine motor, sensory integration, and internal organization and balance, in a reliable assessment.

### vii. "Despite the behavioral supports and other special education services, J.F.'s behaviors continued to disrupt school-wide operations, exhausting all available resources at Dolvin."

72.    Denied.

73.    Denied.

74.    Denied.

75.    Denied.

### viii. "After FCSD exhausted all available resources at Dolvin, J.F.'s IEP team determines the GNETS program at New Prospect was the LRE in which J.F. could receive FAPE."

76.    Admitted.   Defendants state J.F.'s IEP of March 16, 2018, speaks for itself.

77.    Denied.  Defendants state that Mr. Trotman is a person with knowledge of the educational needs of J.F. and was or should have been a member of the IEP

Team.  Defendants say the FBA conducted by Mr. Trotman is a document that speaks for itself and that "feedback sessions" are not separate and apart from IEP meetings and that information provided by independent educational evaluators to IEP Team members must be used to make recommendations for the IEP. Defendants state that FBA's like the one by Mr. Trotman, are not just diagnostic tools that explain the cause of behaviors (i.e. – a "sensory condition"), but rather assessment tools employed in the science of applied behavioral analysis (ABA) – which isolate the functions of a child's behavior so that target behaviors can be managed in the classroom setting and appropriate replacement behaviors can be taught, all so a BIP can be designed on science rather than supposition.  FBAs can provide expert recommendations for services and the location of services.

78.     Denied.  Defendants state that Mr. Trotman's FBA dated March 16, 2018 speaks for itself. Defendants state that the comments attributed to Mr. Trotman were <u>not</u> made on March 16, 2018 or to the IEP Team during any meetings regarding J.F.'s educational program.[12]

---

[12] The statements attributed to Mr. Trotman in paragraph 75 are misrepresented as being made during the IEP meeting on March 16, 2018.  The audio file and transcript of that meeting are part of the record in this case and speak for themselves.  Defendants further state that Mr. Trotman's recommendations during the IEP Meeting were that J.F.'s behaviors were improving with the revised BIP, and his suggestions were to improve the BIP, and continue to build on the progress made by J.F. from January to March 2018.

79.     Denied.  Defendants state that Mr. Trotman was directed by FCSD not to participate in the remainder of the March 2018 IEP meeting. Defendants further state that the behavioral data collected by FCSD from January to March 2018 showed that J.F.'s behaviors were declining and the careful characterization of J.F.'s behaviors by Plaintiff, from "previous five days" before the March 2018 IEP meeting is not an appropriate data set by which to recommend segregation of a student outside the traditional educational setting. Again, FCSD ignored science. Defendants further incorporate the response to paragraph 67 here by reference.

80.     Denied.  Defendants further state that the language used in paragraph 77 is not supported by the behavioral data collected by FCSD, and is mere boilerplate IEP document language used by FCSD when making student placements at GNETS.  Defendants state that the language in paragraph 77 fails to contemplate all the considerations required by IDEA when making a more restrictive educational placement pursuant to 34 C.F.R. §§ 300.114- 300.116 (LRE).

81.     Denied.  Defendants state that all members of the IEP team did not agree with the placement at GNETS, nor find that the IEP and BIP could not be implemented in a mainstream placement, and deny that J.F. received any "additional resources" that constituted appropriate educational and behavioral support.  Defendants state that FCSD had not "exhausted all means" to provide J.F. FAPE, since, Appellant failed to properly evaluate J.F., failed to identify him as a child with a language and sensory integration disorder, and failed to

provide any appropriate therapy for these challenges they were unaware of because of their own inappropriate evaluations, and prematurely removed J.F. even when his behavior had settled and was improving. This allegation also presumes FCSD had a full range of services available, which is denied.

82.     Denied. The March 16, 2018 IEP document and report of Mr. Trotman from Southern Behavioral Group speak for themselves.

83.     Denied. Defendants state that the FCSD's inappropriate OT evaluation was presented to the IEP Team and the evaluation report speaks for itself. J.A., as a member of the IEP Team, did not conclude that J.F.'s sensory integration challenges did not impact his educational progress and did not agree with the conclusions of the school members of the IEP Team.

84.     Denied. Defendants state that the BIP from March 16, 2018 speaks for itself and reflects FCSD 's use of Dr. Alexander's (of CBC) adoption of many of the recommendations of Mr. Trotman, yet it failed to allow implementation.

**C.     "J.F.'s problem behaviors improve dramatically in GNETS, without the benefit of OT or SLP services.**

     **i. J.A. removes J.F. from school until the following school year."**

85.      Denied. The placement decision made at the March 16, 2018 IEP meeting was <u>not</u> agreed upon by all members of the IEP Team as J.A. disagreed with the FCSD decision and notified FCSD of that disagreement and her intention to remove J.F. from the placement and exercise her parent rights under IDEA.

Defendants deny the statement in footnote 14 and specifically state that as a five-year old child, J.F. was not obligated to attend a public school and as the program was not appropriate, any time that he was not attending in the FCSD placement cannot be characterized as "missed." Defendants state that J.A., J.F.'s mother, is a public school teacher and provided J.F. some supplemental instruction during the time he was not formally enrolled in pre-kindergarten. She also continued to assess his needs, identifying his ADHD which FCSD missed.

### ii. "J.F.'s GNETS classroom at New Prospect."

86. Denied. Defendants state that GNETS classroom and school environment at New Prospect are segregated physically and conceptually from the other parts of New Prospect Elementary School. Defendants state that GNETS students are physically separated from the NPES students, not allowed to integrate in common areas such as the lunchroom or the playground, and participate in school-wide events separate from the rest of the school and their own events.

87. Denied. Defendants state that Mr. Jordan is no longer J.F.'s teacher and that his training is substantially similar to the training of other educators in the FCSD, though his experience is unfortunately limited by his GNETS experience. Defendants deny Mr. Jordan follows the statewide curriculum without unilateral modifications that affect the level of instruction, the pace of instruction and therefore the amount of information a student in his classroom is able to access in one school year. Defendants further state that the students in Mr. Jordan's

GNETS classroom varied from as few as three to as many as eight students and the teacher to student ratio is directly affected by that change.

88.     Denied.  Defendants state that J.F.'s behaviors at Dolvin were improving prior to his removal to GNETS and that any escalation in J.F.'s behaviors at GNETS was the result of a failure to implement appropriate behavioral and educational supports in the segregated setting.  Defendants further state that Mr. Jordan never received any training regarding J.F.'s BIP, never inquired of Dr. Alexander or Mr. Trotman about J.F.'s BIP, and then affirmatively and unilaterally decided not to implement the BIP created by Dr. Alexander. Defendants deny that Mr. Jordan's appropriately collected data in accord with J.F.'s BIP as a result of the lack of training and communication with the BCBA's responsible for the program and FCSD and GNETS administrative indifference.

89.     Denied.  Defendants state that the one-size fits all token system used by Mr. Jordan is unrelated to and completely different than the measurement of student progress on IEP goals and objectives.  Defendants state that goal progress and mastery are determined by the IEP Team and that specific incidents in the classroom would not constitute goal failure or mastery.   Defendants further state Mr. Jordan would impose punishments, like taking a Jordan Buck away from a student, and such punitive responses are not an appropriate part of a positive behavioral intervention system but set it back.  Defendants state that J.F.'s continuing progress in the GNETS classroom was the result of many

factors, and not simply the one-size fits all token system used by Mr. Jordan, and many other teachers in NPES. Defendants deny the statement in footnote 16.

### iii. "J.F.'s significant behavioral improvements in GNETS."

90.     Denied. Defendants state that J.F.'s behavior at Dolvin, after the implementation of the BIP created by Dr. Alexander, was improving with less frequent behavioral episodes, and spikes as a result of changing the behavior plan between January and March 2018. J.F.'s improving behavior continued when J.F. was segregated at GNETS and from August to October 2018, the beginning of the 2018-19 school year, J.F. mastered all four of the behavior objectives in his IEP, and mastered his behavior goal. J.F.'s behavior following breaks in service is typical, and is the reason IDEA contemplates consideration of extended school year services (ESY) for students with disabilities.

91.     Denied. Defendants admit that J.F. mastered the behavioral goal in his IEP in October 2018 and according to GNETS procedures for "re-integration" had met the number one criteria for being released from GNETS. Defendants emphatically deny that "it is undisputed that 27 acts of aggression per day is still not appropriate behavior" as that fact is expressly disputed. Defendants state that J.F.'s mastery of his behavior goal and his continued appropriate behavior in GNETS was the criteria for release from GNETS (set by FCSD and GNETS/DOE) and any "appropriate behavior" standard is outside the FCSD, GNETS and IDEA procedures. Defendants further state that GNETS data cannot be relied upon as

the GNETS data attributed sporadic incidents into hundreds of behaviors on a day while GNETS staff reported to J.F.'s mother that he had a "great" day.

92.     Denied.  Defendants admit that J.F.'s continuing positive behavior reflects that FCSD and GNETS had prematurely placed J.F. in GNETS and then inappropriately required him to remain trapped in that setting.  Defendants further state that J.F. was required to master a goal of zero incidents of target behaviors before FCSD or GNETS would consider J.F.'s partial release from GNETS despite this criteria not being in any IEP document, never having been discussed at an IEP meeting, and was unsupported by even behavioral experts that had been working with J.F.  Defendants show that a standard that requires a student with behavioral challenges because of a disability to exhibit more behavioral control than a non-disabled regular education student is improper.

93.     Denied.  Defendants state that J.F.'s continuing positive behavior at the beginning of the 2019-2020 school year was further evidence that J.F. did not require any GNETS placement and the characterization of J.F.'s behavior as a "suicidal outcry" is completely incorrect and the result of J.F.'s inappropriate placement at GNETS, and knowingly false.

**D. "The ALJ's Final Decision."**

94.     Denied.  Defendants admit that OSAH held an administrative hearing and that evidence presented by Plaintiff in support of its position.  Defendants state

further that such evidence was rejected by the ALJ who ultimately found that Plaintiff's denied J.F. FAPE and the LRE during all applicable time periods.

95.     Admitted.  Defendants state that the ALJ's Final Decision dated January 21, 2020 speaks for itself and contains many other findings.

96.     Admitted, though the Complaint only sets out part of the reasoning.

97.     Admitted, though there are other findings by the ALJ with respect to the failure by Plaintiff to comply with the procedural and substantive requirements of IDEA.

98.     Admitted, though there are other orders from the ALJ regarding the relief appropriate to address the denial of FAPE by Plaintiff.

99.     Denied.  Defendants state that the ALJ order speaks for itself and includes several other elements of speech/language therapy recommended by Ms. Cohen in her report, including specialized instruction in reading and FastForWord. Final Decision, at ¶39, p. 16.

100.    Admitted but there are other aspects of the Order regarding the provision of appropriate and compensatory OT services for J.F.  Defendants state that the therapy recommended by Ms. Wing included individual therapy, group therapy, and an OT consult with J.F.'s teachers, working on specific needs.

101.    Admitted that FCSD accurately states the compensatory part of the Order.

102.    Admitted.

103.    Denied.

## "ENUMERATIONS OF ERROR IN THE FINAL DECISION"[13]

104.    Denied.

105.    Denied.  Defendants state that the Plaintiffs conflate "behavioral services" that are available in public schools to all students, and those special education services available to students with disabilities in need of special education.  It is undisputed that J.F. was not receiving any appropriate special education services, including appropriate behavioral supports, in October 2017.

106.    Denied.

---

[13] Defendants deny each and every reference Plaintiff makes to "undisputed" facts based on "hearing evidence" in paragraphs 104 to 135 of the Amended Complaint.  Defendants state that Plaintiff manipulated and misrepresented the hearing evidence in order to correct pleadings errors previously identified by Defendants.  In doing so, Plaintiff incorrectly highlight events in the chronology to overcome failures in meeting obligations set by IDEA procedures, assign incorrect meanings and definitions to services provided to overcome failures in meeting substantive guarantees of IDEA, and claim several times that evidence is "undisputed" simply because the quotation pulled from the hearing record exists.  Such evidence is obviously not "undisputed," as Defendants presented contrary probative evidence accepted by the ALJ.  As the process contemplates, the evidence was considered by the ALJ and weighed against contrary evidence.  The ALJ then determined which of the evidence was more or less probative, and/or presented in testimony from witnesses whose credibility the ALJ properly evaluated, and/or consistent with reliable documents and assessments, and either credited or discredited testimony.  Calling these facts "undisputed" because they exist at all in the record is intentionally misleading and ignores the actions of the ALJ who considered and rejected Plaintiff's positions.  Finally, Plaintiff repeatedly failed to identify the actual error of the ALJ, whether their allegations are of matters of fact or law, while misstating and stating out of context the ALJ's Final Decision. This is one aspect of the continuing "shotgun pleading."

107.    Denied.  Defendants further identify for the Court Plaintiff's intentional distortion of the timeframes for when FCSD had considered GNETS and when J.A. became aware that GNETS was a potential placement option, to support an erroneous allegation.  The chronology of these events are clearly established in the hearing record and show that J.A. was not aware a GNETS referral had been made on February 1, 2018, the date of the referral document and the IEP document does not state that the referral was made but that the IEP Team (school members only) _**were merely considering**_ GNETS, a step that would naturally happen _**before**_ a formal referral is made.

108.    Denied.  See footnote 13 incorporated herein.

109.    Denied. See footnote 13 incorporated herein.

110.    Denied.  See footnote 13 incorporated herein.

111.    Denied. See footnote 13 incorporated herein.

112.    Denied.  See footnote 13 incorporated herein.

113.    Denied. See footnote 13 incorporated herein.

114.    Denied. See footnote 13 incorporated herein.

115.    Denied and denied as stated. This intentionally misstates the Final Decision's language and manipulates the chronology established in the hearing beyond recognition.  This allegation is an example of the intentionally erroneous approach as it attacks the Final Order language as to the fall of 2018-2019 by pretending these address March 2018, the school year before. Plaintiff is correct

that in March 2018 this information did not exist, though it did in October 2018, and its own inadequate evaluations were the reason that J.F.'s ADHD was overlooked by it. See also footnote 13 incorporated herein.

116.    Denied and denied as stated. FCSD fails to give a basis for this alleged erroneous finding. This intentionally misstates the Final Decision.  See footnote 13 incorporated herein.

117.    Denied and denied as stated. FCSD fails to give a basis for this alleged erroneous finding. This erroneously states the Final Decision.  See footnote 13 incorporated herein.

118.    Denied and denied as stated. This erroneously states the Final Decision.  It again mixes timeframes. See also footnote 13 incorporated herein.

119.    Denied and denied as stated. This erroneously states the Final Decision and the record.  See footnote 13 incorporated herein.

120.    Denied. This intentionally and erroneously misstates the Final Decision and the record.  See footnote 13 incorporated herein.

121.    Denied.

122.    Denied. This intentionally and erroneously misstates the Final Decision and is so vague and confusing that it cannot be answered.

123.    Denied as to the factual and legal allegations. This mischaracterizes the legal conclusion and the record, and offers no further basis for response.

124.    Denied. This intentionally and erroneously misstates the Final Decision. See footnote 13 incorporated herein.

125.    Denied.  See footnote 13 incorporated herein.

126.    Denied, and FCSD fails to identify the error, or whether it was fact or law. See footnote 13 incorporated herein.

127.    Denied.  See footnote 13 incorporated herein.

128.    Denied.  See footnote 13 incorporated herein.   Defendants state and specifically note that in arguing error here and elsewhere in the Amended Complaint on this issue, FCSD ignores Jordan's testimony that – "… *If he's going to go out to any of those classrooms, there should be zero aggressions."* Vol. IV, p. 1524, Testimony of Jordan (GNETS teacher)(emphasis supplied).[14]

129.    Denied.  See footnote 13 incorporated herein.

130.    Denied.  See footnote 13 incorporated herein.

131.    Denied. Defendants incorporate their response to paragraph 128. See footnote 13 incorporated herein.

132.    Denied. See footnote 13 incorporated herein.

133.    Denied. See footnote 13 incorporated herein.

---

[14] On cross-examination Jordan realized the problem with his direct testimony, and flipped when confronted then claiming "I never said that that." Id., Vol. IV, Tr. P.1606. The transcript does not show the reaction across the courtroom, or the passage of time, but this is one example of why the ALJ should be endorsed with making this credibility decision, as Jordan demonstrated he was not credible.

134. Denied. See footnote 13 incorporated herein.

135. Denied. See footnote 13 incorporated herein.

136. Denied. See footnote 13 incorporated herein.

137. Denied and denied that FCSD evidence was disregarded. It is denied that evidence supporting the Final Decision was "biased" and "self-serving" and specifically denied there is any basis for "bias" or that it was preserved as error.

## VII. CLAIMS FOR RELIEF

## A. COUNT 1: IDEA

138. Defendants state that such incorporation by reference is inappropriate and fails to meet the pleading requirements of this jurisdiction or the federal rules of civil procedure.

139. Denied

140. Denied

141. Denied

## B. COUNT 2: Declaratory Judgment

142. Defendants state that such incorporation by reference is inappropriate and fails to meet the pleading requirements of this jurisdiction or the federal rules of civil procedure.

143. Denied

Defendants deny that additional evidence is necessary in this matter.

Defendants further deny that Plaintiff is entitled to any relief sought in Plaintiff's unnumbered prayer for relief at page 50 following numbered paragraph 143.

### PART II - COUNTERCLAIMS OF J.F. AND J.A.

### A. DEFENDANTS' RESTATEMENT OF FACTS

1. Defendants in support of their counterclaims incorporate Complaint ¶¶ 1, 3, the first sentence of ¶ 4, and ¶¶ 10, 11, 15, 17, 18-22, as modified and answered above and the Answer's Responses to ¶¶ 25, 29, 36, 38, 45,52-54, 57, 61-64, 83, 85 and 89, and Doc.1-1 and 1-2, attachments to the Complaint.

### B. STATUTORY AND LEGAL RIGHTS AFTER AN ALJ DECISION

2. Under IDEA, Section 504 and State law implementing IDEA, there are specific mandatory, non-waivable obligations concerning placement.

> "Among these safeguards is the so-called 'stay-put' provision, which directs that a disabled child "shall remain in [his or her] then current educational placement" pending completion of any review proceedings, unless the parents and state or local educational agencies otherwise agree."

Honig v. Doe, 484 U.S. 305, 308 (1988).

3. "With the stay-put provision, Congress has provided procedural protection to disabled children and their parents by preventing unilateral action by school administrators in contravention of a child's or parent's objection, until the completion of review proceedings." CP v. Leon County Sch. Bd., FL., 483 F.3d

1151 1156 (citing Honig, 484 U.S. at 323 and Tenn. Dep't of Mental Health and Mental Retardation v. Paul B., 88 F.3d 1466, 1472 (6th Cir.1996)).

4.   The provision amounts to, "in effect, an automatic preliminary injunction," Zvi D. v. Ambach, 694 F.2d 904, 906 (2d Cir.1982), maintaining the status quo and ensuring that schools cannot exclude a disabled student or change his placement without complying with due process requirements. Paul B., 88 F.3d at 1472.

5.   Stay-put or "maintenance of placement" has a well understand unilateral enforcement provision, i.e., the placement can change by agreement between the "State or local educational agency and the parents." 20 U.S.C. § 1415(j). Courts for years interpreted this "agreement" provision to include a change in the actual services when a parent *wins* in a due process challenge to the IEP and/or placement, as that is an "agreement" between the "State" and the parents. IDEA was changed to reflect this and the IDEA regulation now provides:

> **§ 300.518 Child's status during proceedings.**
>
> **(d)** If the hearing officer in a due process hearing conducted by the SEA or a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State and the parents for purposes of paragraph (a) of this section.

Id.  See also Record, J-3 (Parents Rights Form), at 5, #16 (Stay-put right).

6.   This new, changed by ALJ order, stay-put continues throughout any court proceedings. 34 C.F.R. § 300.518(a). It lasts through all subsequent court actions and appeals. See Oshua A., through Jorge A., v. Rocklin Unified School

District, 559 F.3d 1036 (9th Cir. 2009) (stay-put through federal circuit court of appeals); Joshua Andersen et al v. Andrew Jenkins, Superintendent, D.C. Public Schools, 877 F.2d 1018 (D.C. Cir. 1989) (thru district court); M.R. v. Ridley School District, 744 F.3d 112 (3rd 2014).

7.     IDEA provides that a court shall "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i) (2)(C)(iii)(2004). The "only possible interpretation is that the relief is 'appropriate' in terms of the purposes of the Act." Sch. Com. of Burlington v. Dep't of Educ., 471 U.S. 359, 370 (1985). This can include full compensatory services by the district court even in excess of those earlier awarded by the ALJ. See Draper v. Atlanta Ind. Sch. Sys., 518 F.3d 1275, 1285-87 (11th Cir. 2008).

## C. DEFENDANTS'/COUNTERCLAIM ADDITIONAL FACTS

8.   On January 21, 2020, the ALJ issued a Final Decision finding Plaintiff (FCSD) violated Defendants' (J.F. and J.A.) rights to free, appropriate public education in the least restrictive environment.  See also Complaint, ¶ 91.

9.   The parties received the Order on January 22, 2020. At the time of the Final Decision Jamir was seven (7) and should have been in the 2nd grade.

10.  J.F. and J.A., in counterclaim restates and re-avers ¶¶ the first sentence of 91, 97, 98, 99, 100, 101 as modified by the answers and response thereto.

11. The Final Decision ordered FCSD to "hold an IEP meeting to conform J.F.'s IEP to the terms of this Order." See also Amended Complaint, ¶ 102.

12.  At the time of the Final Decision J.F. had been held in the challenged placement throughout the eighteen plus months from his beginning there (not counting the time he had been withdrawn to avoid the GNETS) and it was thirteen plus months since the due process hearing request, as FCSD refused to agree to any change in placement and enforced the "maintenance of placement" against the Defendants. Under IDEA, state law and FCSD's Notice of Rights, the placement that is enforced shifts with the entry of an administrative final decision if such decision is in favor of the claims of placement sought by the child or parents, and therefore GNETS was not the legal or appropriate or permissible placement as of January 22, 2020.

13. On January 24, 2020, in the absence of any response from FCSD, Defendants emailed counsel for Plaintiff seeking implementation of the Final Decision, including J.F.'s immediate transition out of the GNETS.   Defendants stated, "I am interested in moving this process forward and appreciate your cooperation in getting all the proper people and information to the IEP table." Defendants Answer, Ex. A[15].

14. On Jan. 27, 2020 Plaintiff responded to counsel for Defendants, but failed to take action and by asking for time, indicating only it would have more information shortly.  Ex. B.  J.F. waited for notice of a meeting and a plan

---

[15] To avoid confusion with the Complaint, Defendants/Counter-Plaintiffs will number their exhibits A, B, etc., and maintain their designation as Defendant.

to implement the Final Decision and did not contact FCSD for the next ten (10) days, allowing FCSD the time it sought but without waiving any rights. It was only after Defendants had to email FCSD again on February 6, 2020 that Plaintiff had any response.  Ex. C.  In response, Fulton suggested an IEP date of March 12, or fifty-one (51) days after the Final Decision had been issued and five (5) weeks into the future for just the ordered meeting.  It offered no interim services or transition plan and sought no waiver to stay put. Ex. C.

15. In reply, and with growing concern that Plaintiff had not taken any actions as directed by the Final Decision, nor as required under the IDEA "Maintenance of Placement" provision,[16] Defendants sought information about the details of J.F.'s planned transition including the services that had been organized to ensure a safe and successful transition, and the description of location where J.F. would be enrolled after leaving GNETS.  Ex. D (Email, Feb. 10, 2020).  Defendants stated expressly that, "We do not waive any rights to the services as of the Court's January 21 order and need to identify that we will pursue additional compensatory educational services for the additional lost time. We also see further delay as making a compensatory plan more and more difficult."  Ex. D.

---

[16] 20 U.S.C. § 1415(j)(2004); 34 C.F.R. § 300.518(d)(2006), shifting placement when a parent prevails to that program ordered by the ALJ.

16. Again, Plaintiff failed to respond appropriately and provided no requested information. FCSD told Defendants that the only location being considered for J.F. was Dolvin Elementary School where J.F. had suffered significant and repeated trauma during the 2017-2018 school year and which remains the subject of litigation for his intentional discrimination. See Ex. E.

17. In response, and with continued and heightened concern over FCSD's delays causing J.F.'s continued placement in GNETS despite a court order removing him from the program, and without information or any FCSD action or plan to meet the "maintenance of placement" obligation, Defendants sent notice to Plaintiff of the intentional and illegal violation of J.F.'s civil rights and sought immediate and effective remediation. Ex. F. Defendants asked for an immediate IEP meeting and the collaborative development of an appropriate educational plan for J.F. with sufficient supports and services based upon the expert evaluations identified by the ALJ in the Final Decision, as per the direction of the ALJ. Id.

18. Again, Plaintiff reluctantly responded but without notice of an IEP meeting or any more information about suggested placements for J.F. Ex. G, p. 2. On February 18, 2020, almost a full month after the ALJ's final decision, Defendants again requested information about J.F.'s transition, the services J.F. would receive and the data upon which decisions would be based. Ex. H, p. 1.

19. On February 25, 2020, after over a month of delay (35 days), Plaintiff convened an IEP meeting. FCSD did not provide any details to Defendants in advance of the meeting regarding how J.F. would be safely transitioned out of GNETS, what behavioral supports would be considered by the IEP Team to ensure FAPE, or how the Plaintiffs proposed to implement the Court's Order, or when. Plaintiff did confirm that Dolvin E.S., the site of J.F.'s traumatic initial school placement, and whose staff called as witnesses made it clear he was not wanted there, would be removed from consideration for placement.

20. At the February 25, 2020 post-Final Decision IEP meeting, Plaintiff openly displayed hostility regarding the ALJ's Final Decision. Several school members of the IEP Team including a key administrator stated they did not agree with the Court's decision. Many school invited attendees, including several from GNETS, contended that they were unaware of the information and document requests made by J.F. and J.A. for the meeting. Records which should have existed were not made available to Defendants.

21. Plaintiff had a proposed IEP distributed to Defendants before the meeting, as J.F. had insisted be done to try and ensure some thought was given to his status and needs, but it was substantially unchanged from the IEP written for J.F. at GNETS months earlier and prior to the Final Decision. Where there were changes, most were unsubstantiated by any educational data and little of the Final Decision provisions were added. Nevertheless,

Plaintiff intentionally added language and issues to the draft IEP that the ALJ had rejected in the Final Decision, trying to undercut or limit the impact of the ALJ's findings and conclusion, or to relitigate what it had lost, or to provoke discord. Most objectionable was that FCSD added a statement that part of Jamir's language impairment/articulation disorder was due to his race as a young Afro-American child, i.e., his impairment was actually AAE (Afro-American English), rather than a disorder that should be treated and could be corrected. This was unsupported by evaluation or any referral or note in any educational record, and had not been accepted as a defense at trial.

22. At the meeting, this unsubstantiated theory was presented by a FCSD employee who admitted that she had never assessed J.F., had never seen him or even heard him speak. There was no assessment that supported this claim.

23. Many of the FCSD and GNETS staff FCSD brought to the IEP meeting were unprepared to collaborate or contribute to an appropriate new IEP or to a transition plan. FCSD brought back Dr. Jennifer Alexander, the BCBA it called at trial who had re-written the BIP in 2018 but whose services ended when J.F. started at the GNETS. Dr. Alexander stated at the meeting she could not write a plan or amend the BIP as she was now unfamiliar with J.F. and would have to observe him first. She had not been asked to observe at any time since the spring of 2018, nor in the five (5) weeks since the transition was ordered.

24. Trying to collaborate, J.F. tried a different approach and brought two independent experts who had conducted the IEEs in OT and SLP, who had testified at trial and whose recommendations had been adopted in the Final Decision. Nevertheless, this did not lead to a completed IEP or even a proposed plan for placement or transition from FCSD.

25. The IEP Fulton created for J.F. on February 25, 2020 was <u>not</u> complete and did not contain all the components of the ALJ's Final Decision as required by the ALJ. The IEP did not include the recommendations of Ms. Cohen's IEE report, full details of the occupational therapy services ordered by the ALJ, or any information regarding the compensatory educational services required by the ALJ. <u>FCSD had no transition plan</u> as it used a staged removal rejected as inadequate for J.F., and the IEP was lacking in accommodations and supports, necessary under IDEA and critical given the prior delays and inadequacy of services from FCSD. The IEP meeting convened by Plaintiff failed to fully implement the ALJ's Final Decision and again denied FAPE. FCSD's incomplete IEP and lack of transition led to more delay as J.F. remained in segregated classes with inappropriate services.

26. During the meeting, Plaintiff was unable to verify J.F.'s present levels of educational performance, a basic part of any IEP and IEP meeting or IDEA instruction, and a basic and expected obligation of a school district, with parental support. Plaintiff presented informal scores on J.F. from a computer

based tool, and when questioned about discrepancies between the assessments and the IEP levels of performance, Plaintiff's staff tried to explain claiming the computer assessments were not valid for J.F. because of his disabilities.

27. The February 25, 2020 IEP meeting lasted six (6) hours, and Plaintiff during the meeting offered no specific plan for transitioning J.F. out of GNETS in a safe, effective and appropriate way. Defendants inquired about communication with J.F. about leaving GNETS and how students typically are transitioned out. Plaintiff stated that J.F. would be treated differently because "he didn't earn his way" out of GNETS and so he would not receive the positive recognition for his educational progress from his teachers and staff. This was true, in part, because FCSD and GNETS staff and administrators didn't agree with the decision and were not planning on following their customary process of celebrating the student, as he was now free of GNETS.

28. From February 25, 2020 to March 15, 2020 (the date of school shutdown due to COVID-19), J.F. remained in GNETS without any transition plan. Yet, J.F. provided proposed IEP additions missing from the document to try to correct it and move forward, but many of these were rejected by FCSD.

29. J.F. asked for valid criterion based assessments to track J.F.'s progress into the co-taught class because of the inadequacy of the computer assessment data and due to the GNETS' unanswered questions concerning Jamir's actual academic performance, and because this is basic educational science for an IEP

process. FCSD administrators refused to agree to this at the IEP Meeting, and then after the meeting again rejected this, leaving J.F. without any further assessment or confirmed functional levels in reading, writing and math when in-person school ended. FCSD was still trying to defend its program and instruction but could not with validity and confidence identify where J.F. stood in ELA and math, or his progress or rate of progress at GNETS.

30. Later, FCSD information now states that J.F. has not completed the state standard curriculum for a second-grade student despite having high average to above average cognitive ability.  J.F.'s instructional placement for first and second grade was in GNETS, and as J.A. always feared, this program directed his fall to almost two grade levels behind in reading and one grade behind in math based on Plaintiff's own testing. This was then made worse by delay.

31. J.F. did not receive the services such as speech/language therapy, occupational therapy, counseling or direct behavioral support from a BCBA, after the ALJ's Final Decision that ordered J.F. to receive such services.

32. The IEP that FCSD allowed and presented was inappropriate, did not meet the requirements of the Final Decision, lacked related services, had inappropriate goals and objectives and was not based on reasonable assessment except where J.F.'s experts were allowed to recommend the services, was not "ambitious based on J.F.'s circumstances and would put him at risk by leaving him further behind in instruction and standards.

33. J.F. remained in the restrictive program the ALJ found inappropriate and without FAPE in the LRE from January 21, 2020, the date of the decision upon which the Final Decision order of eighteen (18) months of compensatory services for almost 2 additional months, or through the COVID-19 cut-off date of in-person instruction on March 15, 2020. He was not allowed to be reintroduced into additional mainstream classes or meet and additionally interact with mainstream age appropriate peers. He was restricted to the GNETS side of the vast playground, separate from other second graders.

34. J.F. was provided no direct in-person transition services and when provided any for co-taught and general education instruction, it was only on March 31, 2020, and it was solely by internet connect and/or video. This was approximately two (2) weeks after children in regular education classes were provided such internet and video instruction.

35. After FCSD rejected J.A.'s input and suggestions to modify the IEP FCSD produced after the Feb. 25, 2020 IEP Meeting, and J.A.'s efforts to reach "consensus" on the IEP including securing for Jamir the provision of the services ordered by the ALJ, J.A. had to finally say to FCSD it was required to act and required to implement removal with what it would allow, but J.A. made it clear she disagreed with the FCSD IEP, program and transition.

36. The IEP J.A. received said it would be implemented on Feb. 26, 2020, but then said it would not be "locked" until there was agreement. J.A. has no idea what "locked" means and sought J.F.'s removal from the improper placement.

37. J.F. was provided no compensatory services through the end of in-person instruction. He had no celebration or transition procedure with his peers, as had others before him, to celebrate his release from GNETS into the mainstream. The incomplete IEP has remained incomplete and inappropriate, without any formal Prior Written Notice. Multiple demands have been made but ignored by FCSD.

38. FCSD failed to take any action IDEA allows to challenge the change in placement, that is here from the Final Decision under 34 C.F.R.§ 300.518(d), to avoid its mandate. Districts may seek a judicial officer alter the shift of the stay put, the known process for altering the maintenance of placement since <u>Honig v. Doe</u> in 1988. It knew its delay was contrary to established law and J.A. provided it notice of that further violation of his rights.

39. J.F. was harmed and had his transition delayed and impaired by the intentional delay, and acts of omission and commission by FCSD.

40. J.F. is harmed and will be harmed and allowed to fall further behind by the IEP and services FCSD is offering and unilaterally implementing.

41. J.A. was removed from direct participation in planning or implementing the Final Decision and maintenance of placement by FCSD.

42. J.F. is a child with a disability of school age qualified for instruction within the meaning of that term under the American's with Disabilities Act, as amended in 2008. Alternatively, he has a disability which results in substantial limitations in major life activities such as learning, and/or he has been treated as such a student by FCSD. He has been determined as such a child by FCSD.

43. FCSD is a public or covered entity and subject to suit under the ADA, and it has consented to such suit.

44. J.F. and J.A. have pled their ADA and Sec. 504 claims administratively, fully litigated their IDEA claims and have exhausted their administrative remedies. Alternatively, any exhaustion and further exhaustion is futile as the OSAH Court denied jurisdiction of their claims.

## COUNT I FAILURE TO IMPLEMENT FINAL DECISION OF ALJ

45. Defendants additionally incorporate by reference the re-averments in paragraphs 1 and 10, and paragraphs 2 to 41 as stated herein, including Doc 1.1.

46. On January 22, 2020 J.F.'s educational placement changed by operation of the ALJ's Final Decision from the GNETS to a co-taught classroom in the FCSD.

47. On January 22, 2020, J.F.'s educational program included speech therapy, occupational therapy, and compensatory educational services as per the ALJ's Final Decision. IDEA and any degree of attempted appropriate instruction required that FCSD promptly plan and implement additional services and supports in transition, through a planned process.

48. FCSD did not initiate any transition of J.F. out of GNETS until after the in-person school shut down on or about March 15, 2020.

49. FCSD did not provide any of the educational services ordered by the ALJ prior to the in-person school shut down on or about March 15, 2020.

50. FCSD intentionally denied and delayed providing the required parts of an appropriate educational program for J.F. as ordered by the ALJ. It failed to plan or made an attempt at timely implementing the Final Decision.

51. FCSD failed to implement those portions of the Final Decision that would appropriately enable J.F. to transition out of the GNETS, ensure stability during that transition, and bring intensive appropriate compensatory educational services to start closing the achievement gap the ALJ determined had been created by FCSD's premature and inappropriately prolonged GNETS placement.

52. FCSD's failure to implement the ALJ's Final Decision and abide by the IDEA "stay-put" procedures, aggravated the educational harm already inflicted by FCSD that increased the gap in achievement between J.F. and other second grade students, continued his isolation and avoided his mainstream placement.

53. The FCSD interim internet-video program was not appropriate or sufficient for J.F. and did not comply with the terms of the Final Decision, either for direct instruction and FAPE or for compensatory services.

54. J.F. is entitled to additional compensatory educational services from FCSD for the failure to implement the Final Decision from January 22, 2020 to date and additional services to those Ordered by the ALJ in the Final Decision.

55. J.F. is entitled to have this Court "shall grant such relief as the court determines is appropriate," 20 U.S.C. § 1415(i)(2)(iii)(2004), even in excess of the relief provided by the ALJ. See Draper v. AISS, 518 F.3d 1275, 1285 (11th Cir. 2008).

## COUNT II  -  INTENTIONAL DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

56. Defendants incorporate by reference re-averments in paragraphs 1 and 10, herein, but with Complaint paragraphs as modified by the Answer and further response to ¶¶ 25, 52-54, 61-66, 87 and 89 and Doc. 1.1 and 1.2., and ¶¶ 12-23, 25-28, 30-36 and 38-44, 72 and 73 of this Counterclaim.

57. FCSD created and maintains a stigma concerning J.F., labeling him as a student requiring placement at a GNETS. It has taken no action to limit that stigma. It stigmatizes him socially and behaviorally, and reduces the perception of his ability and the expectations that he can learn in a mainstream setting.

58. The ALJ determined and FCSD prematurely placed J.F. at GNETS, removing him from a traditional educational environment at five (5) years old and dropping him into a separate program outside the school system and subjecting him to different criteria and procedures, limiting his academic

instruction, peer groupings, social interactions and access to a general education environment. It placed him outside of classes and not with age-appropriate peers, failed to accommodate his environment to meet his age, interests and small size. It limited his socialization within his class, within his school, at recess and in play, without need or justification.

59. The ALJ determined and FCSD failed to provide J.F. with appropriate educational instruction and thereby denied him access to his education during the time J.F. was required to attend GNETS. This was a failure, *inter alia,* to allow him access to the same benefits or opportunity to benefit as nondisabled peers.

60. FCSD failed to take actions throughout 2018, all of 2019 and into 2020 to limit the adverse GNETS placement, despite J.F. mastering goals and objectives in his IEP, not having suffered trauma or any assessed behavioral needs for a GNETS placement including the BASC-3, and the lack of need based on FCSD/GNETS criteria and policy, policy manual and regulation, and reality. J.F.'s GNETS placement was contrary to its own rules. Transition was delayed, knowingly, and placement maintained without justification or oversight.

61. FCSD acted intentionally in refusing to implement the ALJ's Final Decision after January 22, 2020 and such actions were contrary to known conditions and needs, contrary to J.F.'s legal right and its duties to J.F.

62. FCSD's employees stated at the February 25, 2020 IEP meeting that they did not agree with the ALJ's Final Decision and were openly hostile to the implementation of that decision through the IEP process.

63. In the face of such comments and behavior, FCSD intentionally failed to act or correct such actions or approach to J.F., or see to his release and protection.

64. FCSD's employees stated that J.F. would be treated differently upon transition out of GNETS because his release was the result of the outcome of the administrative due process hearing initiated by the Family.

65. FCSD intentionally delayed and denied the release of J.F. from GNETS contrary to the ALJ's Final Decision and without any justification for J.F.'s continued placement at GNETS, and was based on his status as having sought his rights and remedies under federal law.

66. Defendants provided actual notice of discrimination and its failure to act to FCSD including to administrators with the authority to take corrective action, even as J.F. sought effective remedial measures to eliminate the violation of J.F.'s civil rights on February 14, 2020. Exhibit F. This notice was ignored by FCSD.

67. FCSD was recklessly and deliberately indifferent to the actual notice of intentional discrimination provided by Defendants and by the Final Decision, and failed to release J.F. from GNETS until after the in-person school shutdown on March 15, 2020.  It failed to take prompt remedial actions after the Final

Decision, and after the Notice. Its actions were caused by and directly related to J.F.'s status of having sought his rights under federal law, including the ADA.

68. FCSD's intentional discrimination caused Defendants harm.

69. Defendants are entitled to damages from FCSD for the intentional discrimination and violation of J.F.'s civil rights.

### COUNT III  DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO THE AMERICANS WITH DISABILITIES ACT

70. Defendants incorporate by reference the re-averments in ¶ 56 and the Docs. 1.1 and 1.2 of this Counterclaim and ¶¶ 57-59, 64, and 68 herein stated.

71. FCSD failed and fails to provide notice of ADA rights or procedures, and failed to consider J.F.'s rights under the ADA in any meeting or any considerations given him from November 17, 2017 through the filing of this claim. FCSD ignores such 504 and ADA rights once it determines a child is eligible under IDEA, even where this arbitrarily denies ADA/504 considerations.

72. FCSD's use of the GNETS and its placement, into a program, services and instructional setting, was not the most integrated setting appropriate to J.F.'s needs. This setting limited and impaired the achievement of otherwise age appropriate instruction and social interaction and learning. FCSD ignored whether other federally protected rights limited its unilateral GNETS placement.

73. FCSD's use of the GNETS limited J.F.'s access to services, activities and education equal to that of other nondisabled peers, and also to disabled peers

and less disabled peers maintained in general education and school based classes and programs within FCSD. He was not provided appropriate academic instruction on approved Georgia curricula and courses based on his abilities and needs and he did not have an equal opportunity to obtain and learn on general educational standards, nor was his academic instruction planned or implemented to be as effective as provided others.

74. The GNETS placement process and failure to implement the exit or triangularization process with fidelity or when it demanded release, prevented, and had the dual impact of limiting, J.F.'s access to general education environments and social engagement, and was implemented so that his access and movement back into such environments was delayed and ultimately blocked. FCSD, at this GNETS placement, provided J.F. with less behavioral supports and services than available in the mainstream special education environment. It misrepresented the need for the placement as J.F. never was considered to avoid residential placement and its contention that services were "available" at the GNETS was used in lieu of determining whether they were needed. FCSD never addressed or provided many of the services it says were "available" at the GNETS, nor were these needed by J.F., or necessary only at the GNETS. FCSD altered the exit or placement decision, illegally taking it from the IEP Team asserting its demanded GNETS criteria, and then ignored such criteria and declined to act to remove him from GNETS when J.F. met its GNETS criteria.

75. FCSD failed to have alternative programs in place, or IEP or 504 processes to change J.F.'s GNETS placement, and supports other than GNETS, and failed to have a method of oversight for enforcing GNETS own procedures.

76. FCSD actions, and those of the GNETS it permitted and adopted as part of its placement, served to limit J.F.'s access and instruction, but were significantly rejected and ignored when FCSD/GNETS procedures gave J.F. and J.A. additional rights or if used would have led to his release. FCSD's unilateral actions of omission and commission rendered any FCSD/GNETS adopted practices, rules and standards void and meaningless, even if such were legal or valid. FCSD/GNETS abandoned its so called standards and criteria when such would have led to J.F.'s release from the GNETS and maintained his segregation.

77. FCSD's actions and failures to act were known to it, intentional and continued after J.F.'s objection and notice, including that continued placement was contrary to placement in the most integrated setting appropriate for J.F., and also, was contrary even to GNETS rules and procedures, or standards of administration which ensured a safe and appropriate environment.

78. Such actions caused and/or materially contributed to J.F.'s continued unnecessary segregation and placement in the GNETS, his further stigmatization, and limited his access to instruction and social opportunities afforded others.

79. Such actions violate the ADA and give rise for a claim for declaratory and corrective injunctive relief.

WHEREFORE, Defendants and as Counterclaimants, respectfully pray this Honorable Court to

a)  Deny Plaintiff any and all relief;

b)  Affirm the findings of fact and conclusions of law of the ALJ's Final Decision dated January 21, 2020;

c)  Dismiss the Complaint filed by Plaintiffs;

d)   Afford the Defendants "all appropriate relief" as permitted under IDEA, including additional compensatory instruction, compensatory SLP, compensatory OT and other supplemental and additional remedial instruction and therapy, avoiding returning J.F. to the dysfunctional FCSD IEP Team;

e)  Order the appropriate implementation of a transition plan with independent observations and consultation by identified professionals as members of the IEP team at Plaintiffs' expense, and now its continuation of supports and services;

f)  Order the full implementation of a complete and appropriate IEP with placement in the integrated setting sought by the Family, with full supports and services, accommodations and modifications appropriate to J.F., and as has been demonstrated and sought, including adequate and complete services in OT, in SLP as fully found in Ms. Cohen's testimony and report;

g) Under the claims pursuant to the ADA, award J.F. and J.A. compensatory and monetary damages appropriate to their claim;

h) Under the claims pursuant to the ADA afford J.F. and J.A. declaratory and injunctive relief, protecting 504/ADA rights and privileges;

i) Afford the Defendants, and Counter-plaintiffs a full compensatory award of attorneys' fees and costs; and

j) Order and provide all other and further relied deemed just and proper.

Respectfully submitted, this the 24th day of June, 2020.

*/s/ Jonathan A. Zimring*
Jonathan A. Zimring
Georgia Bar No. 785250

ZIMRING LAW FIRM
1425 Dutch Valley Place Suite A
Atlanta, GA 30324
*zimring@zlawyers.com*
*404-607-1600*

*/s/ Craig Goodmark*
Craig Goodmark
GA Bar No. 301428

GOODMARK LAW FIRM
1425 Dutch Valley Place Suite A
Atlanta, GA 30324
404-719-4848
cgoodmark@gmail.com

## CERTIFICATE OF COMPLIANCE

The undersigned identifies that this pleading is filed in Book Antiqua 13, in compliance with the Local Rules of the Court.

*s/Jonathan A. Zimring*
State Bar No. 785250

## CERTIFICATE OF SERVICE

The undersigned herein certifies that the foregoing was filed and therefore served electronically to the identified opposing counsel for the Plaintiff using the Court's electronic filing and service system.

This 24th day of June, 2020.

*/s/ Jonathan A. Zimring*
Jonathan A. Zimring
Georgia Bar No. 785250

ZIMRING LAW FIRM
1425-A DUTCH VALLEY PLACE
ATLANTA, GA 30324
*zimring@zlawyers.com*
*404-607-1600*

*/s/ Craig Goodmark*
Craig Goodmark
GA Bar No. 301428

GOODMARK LAW FIRM
1425 Dutch Valley Place Suite A
Atlanta, GA  30324
404-719-4848
cgoodmark@gmail.com