## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FULTON COUNTY SCHOOL
DISTRICT,

*Plaintiff,*

v.

J.F., by and through J.A., and J.A.,

*Defendants.*

CIVIL ACTION
FILE NO. 1:20-cv-1675-ELR

## DEFENDANTS' BRIEF IN SUPPORT OF
## <u>MOTION FOR AN IDEA MANDATORY STAY PUT INJUNCTION</u>

On January 22, 2020, three years after J.F.'s mother, J.A., exercised her IDEA rights to remove the student from public school because Plaintiff Fulton County School District (FCSD) refused to provide the *five year old* African-American boy an appropriate education in an integrated, less restrictive educational environment, Administrative Law Judge Michael Malahi ordered FCSD to return J.F. to a traditional public school and regular education, and end the segregated program that FCSD had dumped him in. Instead of complying with the Court's order which altered the placement, FCSD initiated a campaign of foot-dragging and delay tactics seeking to avoid imp the Court's order.

FCSD told J.F.'s mother that he would not be treated like other students being returned from this segregated GNETS setting because he had not "earned" his way out, forgetting the decision from the Court that J.F. had been wrongly

assigned to a segregated classroom from the start. J.F. was moved even though the IDEA maintenance of placement provision automatically shifts with the ALJ Final Order to the ordered placement.

From January 22, 2020 to March 15, 2020, FCSD did not remove J.F. from GNETS, and not until after all in-person school had been shut down by COVID-19 did they begin the process. After an ordered educational planning meeting where FCSD did almost nothing to implement the Court's Order, J.F. still did not receive the Court ordered educational services or the compensatory educational services needed to close the tremendous gap in reading created by FCSD's inappropriate placement. J.F. had lost two years in FCSD's placement. Upon entering third grade, J.F.'s achievement gap continues to grow and rather than reaching out to help the student, FCSD continues their delay and defer tactics.

J.F. has filed this motion as the record shows FCSD did not implement the Court's Order on services and FCSD did not change J.F.'s placement. FCSD did not provide J.F. needed therapies. And most problematic, FCSD has failed to provide the compensatory services outlined in the ALJ's Order. Unfortunately, as a result of FCSD's post-hearing conduct, J.F. still cannot read, and has failed to make progress.

# STATEMENT OF FACTS[1]

A.     The Final Decision of January 21, 2020

1.     On January 21, 2020, the ALJ issued a Final Decision finding Plaintiff violated Defendants' (J.F. and J.A.) rights to free, appropriate public education in the least restrictive environment.  Doc. 1-1, p. 22. (Also filed as an attachment to the Amended Complaint as Doc. 18-1, herein referenced as 1-1). The Final Decision ordered FCSD to "hold an IEP meeting to conform J.F.'s IEP to the terms of this Order." Id. at p. 23.  The Final Decision ordered appropriate relief including:

> a. The IEP team shall create an IEP to "transition J.F. back to the LRE, a FCSD co-taught setting."
> b.  J.F. shall receive speech language therapy in accordance with the recommendations of Ms. Cohen's report.
> c. J.F. shall receive individual occupational therapy for two thirty-minute sessions per week, group occupational therapy for two thirty-minute sessions per week, one thirty minute OT consult each week, and a sensory regulation program and social skills group, in accordance with Ms. Wing's report;
> d. J.F. shall receive eighteen months of individualized compensatory education services, designed by the IEP team and including Extended School Year, to close the achievement gap.
> e. FCSD shall hold an IEP meeting to conform J.F.'s IEP to the terms of this order.

---

[1] Defendants have filed this motion on claims of failures arising after the Final Decision of January 21, 2020.  Defendants will separately file a Motion for Judgment on the Record that seeks judgment on Plaintiff's appeal on the underlying facts of the case heard by the Administrative Law Judge ("ALJ"), as this Court reviews that record. 20 U.S.C. § 1415(i)(2004).  For a review of those facts, Defendants refer the Court to the contemporaneously filed Motion for Judgment on the Record and the Final Decision Statement of Facts.

Id.  The Final Decision recognized J.F.'s experts as persuasive and relied upon J.F.'s experts to fashion a remedy.  Doc. 1-1, p. 15-17, ¶38-40.

      B.      <u>FCSD's Post-Decision Delays – January 22 to February 25</u>

    2.          Counsel for Plaintiff, seeking implementation of the Final Decision, with J.F.'s immediate services out of the GNETS, emailed FCSD on 1/24/2020 and stated, "I am interested in moving this process forward and appreciate your cooperation in getting all the proper people and information to the IEP table." Exhibit B, Affidavit of Craig Goodmark (Aff. Goodmark), ¶ 1, Ex. 1.   On Jan. 27, 2020 FCSD responded to but took no action and instead FCSD asked for more time., Aff. Goodmark at ¶ 2, Ex. 2, but, FCSD did not respond again.  On February 5, 2020, counsel for J.F. had to email FCSD again, at which time FCSD responded by suggesting a meeting date fifty-one (51) days (March 12, 2020) after the Final Decision altered the placement.  <u>Id.</u> at ¶ 3; Ex. 3-5.  J.F. rejected this delay and insisted on an earlier date for the IEP Meeting.  <u>Id.</u> at ¶ 6, Ex. 6; Exhibit A, Affidavit of J.A. (J.A. Affidavit), ¶5.  FCSD again failed to react and did not set any immediate date for the meeting or provide any notice of meetings to J.A.  <u>Id.</u>

While waiting for an IEP meeting date to be set, J.A. sought information about J.F.'s transition and where J.F. would receive services once out of GNETS.  J.A. Affidavit, ¶4,6,  Ex. 1, 6; Aff. Goodmark, ¶ 8, Ex. 12, p. 1.  J.A. emailed Defendants asking for that information and notifying FCSD that J.F. ,

"do[es] not waive any rights to the services as of the Court's January 21 order and need to identify that we will pursue additional compensatory educational services for the additional lost time. We also see further delay as making a compensatory plan more and more difficult." Id. at ¶ 6, Ex. 6. On February 14, 2020, with concern over FCSD's delays causing J.F.'s continued placement in GNETS contrary to law, J.A. sent notice to FCSD of the intentional and illegal violation of J.F.'s civil rights and sought immediate and effective remediation. Id. at ¶ 7, Ex. 9.

Again, J.A. requested an immediate IEP meeting and the collaborative development of an appropriate educational plan for J.F. with sufficient supports and services based upon the expert evaluations relied upon by the ALJ in the Final Decision, as per his Order. J.A. Affidavit, ¶4, Ex. 1. On February 18, 2020, after not receiving the plan and information requested, J.A. again requested the plan for J.F.'s release, the services J.F. would receive and the data on which decisions would be based. Aff. Goodmark, ¶ 8, Ex. 12, p. 1.

C.    FCSD Holds a Meeting on February 25, 2020

An IEP meeting was finally convened on Feb. 25, 2020, after over a month of delay (35 days). J.A. Affidavit, ¶ 8; Ex. 38-39. FCSD did not provide J.A. details regarding how J.F. would be safely transitioned out of GNETS, what behavioral supports would be considered or how the Court's Order would be implemented. Id. at ¶9-10. FCSD kept J.F. in the GNETS at New

Prospect Elementary School but they did not provide any transition plan or explain how J.F. would be supported during this time. Id. at ¶10.

At the IEP meeting, FCSD openly displayed hostility regarding the ALJ's Final Decision. Id. at ¶11. J.A. was told by FCSD employees that they did not agree with the Court's decision. Id. School members of the IEP Team, including several from GNETS, stated that they were unaware of J.A's many requests for information and documents. Id. FCSD did not provide J.A. with records which should have existed but were not made available. Id. The proposed IEP for the February 25, 2020 meeting was substantially unchanged from the IEP written for J.F. at GNETS prior to the Final Decision, Id. at ¶12, as if many issues had not been litigated.[2] The changes that FCSD did propose were often not supported by valid educational data and FCSD did not include all of the services ordered by the Final Decision. Id.

The February 25 IEP did include a statement that part of Jamir's language impairment/articulation disorder was due to his race as a young Afro-American child, i.e., his impairment was actually AAE (Afro-American English), rather than a disorder that should be treated and could be corrected. Id. at ¶14, Ex. 39, p. 6 (3rd Sentence of bottom paragraph on page). FCSD had

---

[2] *Compare* Admin. Rec. J-17, p. 8, 14-15 *to* Ex. 39, p. 9, p. For a detailed account of those pre-Decision IEP components carried forward despite the ALJ's Order, see Ex. 45.

presented this "theory" at the hearing but the ALJ rejected it and agreed with Ms. Cohen, SLP-CCC, a private speech therapist who had worked with J.F. that these were impairments, as with other children, not Jamir's race and environment.[3] Id. At the IEP, many of the FCSD and GNETS staff FCSD brought to the meeting were unprepared to collaborate on an appropriate new IEP or to a transition plan. Id. ¶ 14, 15, Ex. 14, 15. Dr. Jennifer Alexander, the BCBA FCSD called at trial who had re-written the BIP in 2018, would not write a plan or amend the BIP as she was now unfamiliar with J.F. She had not been asked by FCSD to observe J.F. at any time since the spring of 2018, nor in the five (5) weeks since the new IEP was ordered. Id. at ¶16.

FCSD did not complete the IEP for J.F. on February 25, 2020 and did not include all the components of the ALJ's Final Decision. Id. at ¶17, Ex. 15-22. The IEP did not include the recommendations of Ms. Cohen's IEE report, full details of the occupational therapy services ordered by the ALJ, or any compensatory educational services required by the ALJ. Id. FCSD had no plan. Id. at ¶18; Ex. 39, 16-17. The IEP did not contain necessary supports, particularly given the delays and inadequacy of services. Id. at ¶19.

---

[3] On *de novo* appeal on the record, J.F. will show that there was <u>no</u> evidence for these race-based arguments as the proponent witness had never assessed, observed or even heard J.F. speak or read. She denied services as he was black.

When J.A inquired into FCSD's conclusions about J.F.'s present performance, as in any IEP, FCSD was unable to verify J.F.'s present levels of educational performance, relying upon informal scores on J.F. from a computer based tool (I-Ready Math) that FCSD admitted was not valid for J.F. because of his disabilities.  Id. at ¶20.  During six (6) hours of meeting, FCSD did not offer any specific steps transitioning J.F. out of GNETS in an effective and appropriate way.  Id.  When asked about how students typically leave GNETS FCSD administrators stated that J.F. would be treated differently because "he didn't earn his way" out of his segregation, so he would not receive the positive recognition for his "progress" from his teachers and staff.  Id. at ¶ 21.  Because FCSD and GNETS didn't agree with the judge's decision they were not planning on following their customary process of celebrating the student, as he was now free of GNETS.  Id.

J.A. did not agree that the IEP of February 25, 2020 was appropriate or calculated to confer meaningful educational benefit to J.F.  Id. at ¶22.  Also, J.A. objected to the IEP because it failed to implement the Final Decision. Id. Despite J.A.'s repeated requests to implement the Court's Order, from February 25, 2020 to March 15, 2020 (the date of school shutdown due to COVID-19), J.F. remained in GNETS without any plan or change in services. Id. at ¶ 22, 29.  J.A., provided FCSD proposals for services and supports missing from the IEP to try to correct it and move forward.  Id. at ¶23;

Goodmark Aff., ¶ 9; Ex. 18, 24, 29, 35. J.A. asked for valid assessments for a baseline for compensatory services and to track J.F but FCSD administrators refused at the IEP Meeting.  Id. at ¶23; Goodmark Aff., ¶9, Ex. 15, 22, 23, 29.

### D.  FCSD's Post-IEP Footdragging

The day after the meeting J.A.'s counsel, sent an email requesting information about assessment records discussed at the meeting but never provided to J.A.  Goodmark Aff. at ¶9, Ex. 15, 17.   However, with each request for information or suggested service, FCSD either deferred, delayed or maneuvered to avoid actually implementing J.F.'s IEP.  See Ex. 44 (Summary of Correspondence of Between JF and FCSD).  From March 2 to March 17, FCSD volleyed J.F.'s requests for information, service or action back to J.F.  Goodmark Aff., ¶ 9, Ex. 18, 24-26.

As FCSD obfuscated and evaded providing service to J.F., this student with normal or higher intelligence had fallen almost two grade levels behind in reading and one grade behind in math.   Affidavit of J.A., ¶ 24; Ex. 39 (IEP PLOP, p. 4-5).  This was aggravated by FCSD's delay in getting J.F. into an appropriate educational placement and receiving the compensatory education the ALJ ordered.  J.F. did not receive all of speech/language therapy, occupational therapy, counseling or direct behavioral support from a BCBA, ordered by the ALJ in the Final Decision.   Affidavit of J.A at ¶ 25, 26; Doc. 1-1-1; *compare* Ex. 39 (2/25/20 IEP).

J.A. wanted J.F. to be reintroduced into additional mainstream classes and meet and interact with mainstream age appropriate peers now required in January 2020.  Affidavit of J.A., ¶27.   This did not happen and J.F. was restricted to the GNETS from January to March 2020, separate from other second graders, not even allowed to use the main playground.  Id.   It was not until March 31, 2020 when J.F. was removed from GNETS virtually, with FCSD's delay having robbed him of a real transition, when he was allowed to connect via internet almost two (2) weeks after children in regular education classes were provided such internet instruction. Id. at ¶27, 29.

A "revised IEP" was sent to J.A. on April 2, 2020 – another two weeks after the District had stated its positions with several incoherent questions, semantical disagreements, and manipulations of confidentiality rights to create more issues for delay.  Goodmark Aff. at ¶ 9, Ex. 26, p. 2.  A day later J.A.'s attorney responded by trying to resolve the planning issues and proposed working towards resolving the matter completely.  Id., Ex. 28, p. 3-4. FCSD responded by rejecting the offer without making any counteroffer and pushing a fictional narrative that they are without control over the confidentiality issues that delayed J.F. being served by Dr. Alexander.  Id.

In response to FCSD's repeated questions about the Family's objections to the IEP, J.F. counsel sent a second detailed list of disagreements regarding the substantive components of the 2/25/2020 IEP. Id., Ex. 29.  After another

week passed, FCSD responded and asked for a "redline" of the 2/25/2020 IEP, but did not explain how such a task could be technically accomplished or how this was required by rule or law or different than the previous information already provided, or what it would do when this was again restated. Id. at ¶ 10, Ex. 30. J.F. remained in the restrictive program the ALJ found illegal as without FAPE or the LRE from January 21, 2020 through the COVID-19 cut-off date of in-person instruction until March 31, 2020.[4] Affidavit of J.A at ¶ 27, 29. He was restricted to the GNETS side of the vast playground, separate from other second graders. Id. J.F. had no real transition and it was only on or after other children in regular education classes were provided internet and video instruction that J.F. received his access. Id.

J.F. has not been provided any compensatory services through the end of in-person instruction and into the 2020-2021 school year. He had no celebration or transition procedure with his peers, as had others before him, to celebrate his release from GNETS. The incomplete IEP has remained in place and inappropriate, without any formal Prior Written Notice despite multiple demands for such notice from J.A. that have been ignored by FCSD.

---

[4] The IEP received said it would be implemented on Feb. 26, 2020, but FCSD then said it would not be "locked" until there was agreement. DSUMF, ¶69. J.A. had no idea what "locked" meant so J.A, sought J.F.'s removal from the GNETS. Id.

## ARGUMENT AND CITATION OF AUTHORITY

J.A. should be granted their motion to enforce the maintenance of placement, sometimes seem as a statutory and mandatory preliminary injunction. This arises on their pled counterclaim. FCSD 1) failed to implement the Court's Order of January 21, 2020; and 2) violated the "maintenance of placement" obligations of I.D.E.A. from January 21, 2020 to date. J.A.'s undisputed evidence presents a clear picture of FCSD's refusal to implement the Court's Orders and their continuing foot-dragging and delay tactics, and as their intent may not be relevant the issue can start with undisputed evidence of its acts of omission. FCSD had a legal obligation to act in a timely and appropriate fashion irrespective of the fact that they "did not agree with the Court's Order."

## I.      STANDARD OF REVIEW ON STAY PUT INJUNCTION

Defendants seek declaratory and injunctive relief to enforce the mandatory "maintenance of placement" required by IDEA regulations. 34 C.F.R. § 300.518. By operation of law, the ALJ's decision in favor of Families seeking change in placement is "treated as an agreement between the State and the parents," thereby altering the student's placement to the placement proposed by the Family and agreed upon by the ALJ. Id., see also, Ga. Admin. R. & Reg. §160-4-7-.12(3)(hh),(kk). This "stay-put" placement is mandatory and non-waivable.

## II.    VIOLATION OF IDEA MAINTENANCE OF PLACEMENT REGULATION

Under IDEA, Section 504 and Georgia law enforce a mandatory, non-waivable obligations concerning placement, requiring that it be maintained.

> "Among these safeguards is the so-called 'stay-put' provision, which directs that a disabled child "shall remain in [his or her] then current educational placement" pending completion of any review proceedings, unless the parents and state or local educational agencies otherwise agree."

Honig v. Doe, 484 U.S. 305, 308 (1988). FCSD used this to keep J.F. in the GNETS.

"With the stay-put provision, Congress has provided procedural protection to disabled children and their parents by preventing unilateral action by school administrators in contravention of a child's or parent's objection, until the completion of review proceedings." CP v. Leon County Sch. Bd., FL., 483 F.3d 1151, 1156 (citing Honig, 484 U.S. at 323 and Tenn. Dep't of Mental Health and Mental Retardation v. Paul B., 88 F.3d 1466, 1472 (6th Cir.1996). The provision amounts to, "in effect, an automatic preliminary injunction," C.P. at 1156, quoting Zvi D. v. Ambach, 694 F.2d 904, 906 (2d Cir.1982), maintaining the status quo and ensuring that schools cannot exclude a disabled student or change his placement without complying with due process requirements. Paul B., 88 F.3d at 1472.

Stay-put or "maintenance of placement" has a well established unilateral enforcement provision, i.e., the placement changes by agreement between the "State or local educational agency and the parents." 20 U.S.C. § 1415(j). "[T]he

decision of the Supreme Court in <u>Burlington</u> established that a ruling by [the ALJ] in favor of the parent's position constitutes agreement." <u>Susquenita Sch. Dist. v. Raelee S.</u>, 96 F.3d 78, 83 (3rd Cir. 1996). When a parent *wins* in due process challenging the program that is an "agreement" between the "State" and the parents. The IDEA regulation now provides:

> **§ 300.518 Child's status during proceedings.**
>
> **(d)** If the hearing officer in a due process hearing conducted by the SEA or a **State review** official in an administrative appeal agrees with the child's **parents** that a change of placement is appropriate, that placement must be treated as an agreement between the **State** and the **parents** for purposes of paragraph (a) of this section.

<u>Id.</u> <u>See also</u> Record, J-3 (Parents Rights Form), at 5, #16 (Stay-put right).

This new, ALJ ordered stay-put placement continues throughout any court proceedings. 34 C.F.R. § 300.518(a). The duty to implement stay-put is immediate. It lasts through all subsequent court actions and appeals. <u>See Oshua A., through Jorge A., v. Rocklin Unified School District</u>, 559 F.3d 1036 (9th Cir. 2009)(stay-put through federal circuit court of appeals); <u>Joshua Andersen et al v. Andrew Jenkins, Superintendent, D.C. Public Schools</u>, 877 F.2d 1018 (D.C. Cir. 1989) (thru district court); <u>M.R. v. Ridley School District</u>, 744 F.3d 112 (3rd 2014). The "merits of the underlying suit have no impact on whether 'stay-put applies." <u>D.M. v. N.J. Dept. of Educ.</u>, 801 F.3d 205, 215 (3d Cir. 2015). As to its implementation and meaning, "given the remedial purposes of [IDEA] the term 'change in educational placement' should be given an expansive reading."

DeLeon v. Susquehanna Com. Sch. Dist., 747 F.2d 149, 153 (3d Cir. 1984). The term relates to FAPE and LRE, i.e., the program. D.M., 801 F.3d at 215; Anchorage Sch. Dist. v. M.P., 689 F.3d 1047, 1056 (9th Cir. 2012). This applies to related services as well. Doe v. East Lyme Sch. Dist., 790 F.3d 440, 453 (2d Cir. 2015). Similarly, courts allow these challenges independent of the hearing or appeal and without exhaustion of IDEA remedies. E.g., Murphy v. Arlington Cent. Sch. Dist., 297 F.3d 195, 199 (2d Cir. 2002).

Stay-put claims almost always involve a failure to implement the services and therefore are remedied by reimbursement or retrospective compensatory relief and a prospective order. M.R. v. Ridley Sch. Dist., 868 F.3d 218, 227 (3d Cir. 2017). See also Breen v. Jefferson Cty. Bd. of Ed., 853 F.2d 853, 857-8 (11th Cir. 1988)(awarding two years of compensatory instruction for FAPE violation prior to the court's order)(ordering additional years of services as "a deterrent against … unnecessarily prolonging litigation to decrease their potential liability); AISS v. Draper, 518 F.3d 1275, 1289-90 (11th Cir. 2008)("we are mindful that an award of compensation for a violation of the Act is different from the educational program ordinarily required … Compensatory awards should place children in the position they would have been in but for the violation of the Act.")(" … it must be truly compensatory"); Doe, 790 F,3d at 456 (compensatory education and other relief "to make up for any appreciable difference.").

Finally, as relevant here, the ordinary standards of a preliminary injunction do not apply, as stay-put is a statutory right and seen as an "automatic" preliminary injunction. <u>C.P.</u>, 483 F.3s at 1156. The ordinary standards for a preliminary injunction do not apply, <u>Wagner v. Bd. of Educ. Montgomery Cnty.</u>, 335 F.3d 297, 301 (4th Cir. 2003), unless it is the party challenging the placement, or here, the ALJ order's implementation. <u>Johnson v. Special Educ. Hearing Officer</u>, 287 F.3d 1176, 1181 (9th Cir. 2002). An agency can avoid stay-put only by timely seeking injunctive relief. <u>Id.</u> citing <u>Honig v. Doe</u>, 408 U.S. 305 (1988).

Here, there is no dispute that FCSD did not promptly act and then committed multiple stay put violations by slow walking the ALJ ordered IEP meeting and failing to implement the ordered change in placement (LRE) or the implementation of services. The chronology on the implementation of the Court's order speaks for itself:

| | |
|---|---|
| January 21 | Order from ALJ (January 22, 2020 Received) |
| January 24 | J.A. requests implementation of Final Decision |
| February 25 | IEP Meeting required by the ALJ (J.F. made demand) |
| March 31 | J.F. First day of school out of GNETS (virtual as face to face instruction ended by FCSD in March 15, 2020) |
| May 8 | J.F. had received inadequate Speech Therapy and Occupational Therapy and no direct reading instruction as required by the Court's Order |
| To Present | No compensatory education – missing services from Order including from OT, sensory, SLP, reading |

Breaking down the time since the Court's January 21st Order, FCSD first delayed the transfer of J.F. out of GNETS for sixty calendar days and concurrently did not implement the sensory program, or the SLP or the OT as ordered. These were clear in the Final Decision, Doc. 1-1, p. 22-24, incorporating the testimony and the written reports with specific provisions as to what had to be provided. Id. See, Doc. 1-1, p. 22-23 ("in accordance with the recommendations of Ms. Cohen's/Ms. Wing's report"). During that time, FCSD did not petition the Court for any changes to this ordered placement or seek an interim order staying the transfer of J.F. out of GNETS. This is its only option and defense. It did not seek J.F.'s consent to the delay.

FCSD may claim they "were working on it," however, the District needed only to serve notice of an IEP meeting to the Family, set a prompt date for the meeting, prepare, and then hold the meeting. And for services such as the sensory program, occupational therapy, and the Cohen recommendations, these could have started by agreement even before any meeting. Because FCSD had little intention of abiding by the Court's January 21st Order, they did none of this and engaged in stall tactics for two months, maintaining GNETS.

This failure, or "slow walk" lies outside of the immediate stay-put shift, and was continually contested, until J.F.'s further injuries ran into the end of face to face instruction caused by COVID-19. FCSD did not cause the Covid-19

tragedy but it cannot use it as a shield for not timely acting to integrate Jamir into the new placement, to introduce him to his peers and new teachers, to allow him out of the restrictive class, to let him play with others on the broad playground. FCSD ended face to face instruction on March 15, 2020.  <u>When school resumed the next week, J.F. remained in GNETS.</u>  J.F. was <u>not</u> removed from GNETS and placed in the co-taught setting required by the Court until March 31, 2020.  Once in the virtual setting, J.F. did not receive many of the services listed in his IEP, either virtually, face to face, telephonically or otherwise.  In April and May he received a total of 1 hour of OT, not the mandated 90 minutes and 30 minutes of consult. He received at first packets for SLP, not the "intensive speech language therapy to address his significant language delays." These were FCSD's actions under the Order and each violated stay put as each also contributed to the widening achievement gap.  FCSD acknowledged that the IEP was not complete as it also knew it had abandoned much of the ordered instruction.  It had enforced its power to exclude a child with a disability from mainstream education, something <u>Honig</u> and its progeny prohibit.

### III.     FCSD REFUSES TO IMPLEMENT PORTIONS OF THE ORDER

It is not disputed the stay-put placement includes the <u>*services and programs*</u> as ordered by the ALJ when <u>sought</u> by the parents, nor that it remains unchanged throughout any court proceedings under 34 C.F.R. § 300.518(a). <u>See Oshua A., through Jorge A. v. Rocklin Unified School District</u>, 559 F.3d 1036

(9th Cir. 2009)(stay-put through federal circuit court of appeals); <u>M.R. v. Ridley</u> <u>School District</u>, 744 F.3d 112 (3rd 2014). The importance of this right has led courts to apply it retrospectively, e.g., <u>Mackey v. Bd. of Ed. Arlington Cent.</u>, 386 F.3d 158 (2d Cir. 2004)(delay in decision pushes stay put change to when it should have been made). The provision as a statutory injunction is immediate. <u>Bd. of Ed. Pawling Cent. Sch. Dist. v. Schultz</u>, 290 F.3d 476 484 (2d Cir. 2002), *cert. den.* 537 U.S. 1227 (2003). Courts do not allow a district to delay, just as Jamir was not allowed out of the GNETS until he won. Stay put has two sides and he was forced to stay and when he won he should have been released.

The question of the scope of the services occasionally arise in stay put cases. Here the ALJ identified the changes and ordered the IEP team adopt these into the program. This does not allow FCSD any discretion to limit the program. Concerning the ordered services recommended by expert witness Mindy Cohen:

> Mindy Cohen is an expert in speech language pathology. Ms. Cohen's independent evaluation of J.F., dated June 2019, identified a speech sound disorder, a significant mixed receptive-expressive language disorder, a social communication disorder, and a reading disorder resulting from an auditory processing delay and weak phonological awareness skills. Ms. Cohen recommends that J.F. receive intensive speech language therapy to address his significant language delays; she also recommends specialized academic instruction to address J.F.'s delays in reading and Fast ForWord, a brain plasticity computer training that improves a student's ability to process orally presented information.
> …

- J.F. shall receive speech language therapy in accordance with the recommendations of Ms. Cohen's report.[5]

Final Decision, Doc.1-1, p. 16 and 23. FCSD has refused to implement most of these recommendations, claiming that they were not ordered by the ALJ. This is baseless as the Order was without exclusion of any portion of Ms. Cohen's recommendations. Further, Ms. Cohen was accepted as an expert and her remedial recommendations were substantially unrebutted, including her opinion identifying the separate aspects of her speech language assessment that includes reading, communication and speech delays. FCSD further did not rebut Cohen's finding within the scope of her evaluation including those under the headings for "Fast ForWord Auditory Process and Reading," "Speech-Language Therapy" and "Specific, specialize academic instruction." Id. Limiting the terms of the Order and contrary to the scope of the IEE, the professional understanding of speech language assessment and services and the identified recommendations, FCSD has refused to provide Fast ForWord or implement the language/reading part of the evaluation. This unilaterally and illegally revokes what the ALJ Ordered.

The ALJ used a similar device to frame his Order on OT:

J.F. shall receive individual occupational therapy for two thirty-minute sessions per week, group occupational therapy for two thirty-minute sessions per week, one thirty- minute OT consult each week, and a sensory regulation program and social skills group, in accordance with Ms. Wing's report.

[5] Ms. Cohen's report is included in the administrative record, as Petitioner Ex. 69.

Final Decision, Doc. 1-1, p. 23.  There was no OT after January 21 through March 31, 2020.  This ignored two hours every week, plus an additional 30 minutes of consult.  For J.F. when the 2019-2020 school ended, he had missed 12 hours of therapy and 3 hours of consult. A total of 15 weeks or 30 hours, with 7.5 hours of consult resulted in 1 hour of delivered services. That  IEP never had a social skills group and there was no sensory regulation program in the IEP.[6]  On the duty to develop 18 months of compensatory services, there are none.

## IV.   VIOLATION OF THE ALJ'S ORDER TO PROVIDE ORDERED SERVICES AND THE COURT'S BROAD REMEDIAL POWERS

This Court, as the ALJ prior to it, has equitable-like authority to award "all appropriate relief."  20 U.S.C. § 1415(i)(2)(C)(2004);  Burlington Sch. Com. v. Commonwealth of Mass., 471 U.S. 359, 369 (1985). The Family may contest the placement and/or FAPE offered if FSC "had not made FAPE available to the child in a timely manner." 34 C.F.R. § 300.148 (2006). The Court may correct the placement, the IEP, order a new IEP under specific conditions, and afford reimbursements for services or evaluations, and/or compensatory services. E.g., Burlington; Florence County Sch. Dist. v. Carter, 510 U.S. 7 (1993). The Eleventh Circuit has summarized IDEA relief:

---

[6] Though intent is not an element, FCSD provided direct evidence of its motivation at the February 25, 2020 IEP meeting when its school administrator admitted they "just don't agree with the judge."  Affidavit of J.A., ¶ 21.  The intent was not to allow the activities used with other children to celebrate their release from GNETS.  It failed to understand J.F. had proved his release.

The Act directs the district court … to "grant such relief as the court determines is appropriate." 20 U.S.C. 1415(i)(2)(C)(iii). "This Circuit has held compensatory education appropriate relief where responsible authorities have failed to provide a handicapped student with an appropriate education as required by [the Act]." <u>Todd D. ex rel. Robert D. v. Andrews</u>, 933 F.2d 1576, 1584 (11th Cir. 1998) (<u>citing Jefferson County Bd. of Educ. v. Breen</u>, 853 F.2d 853, 857 (11th Cir. 1988)). <u>Compensatory education provides services "prospectively to compensate for a past deficient program." <u>G ex rel. RG v. Fort Bragg Dependent Sch.</u>, 343 F.3d 295, 308 (4th Cir. 2003)(emphasis supplied).

<u>AISS v. Draper</u>, 518 F.3d 1275, **** (11th Cir. 2008). The Circuit further explained:

The Act requires "appropriate" relief, and "the only possible interpretation is that **the relief is to be 'appropriate' in light of the purpose of the Act**." *Burlington,* 471 U.S. at 369, 105 S. Ct. at 2002. "[T]he court enjoys 'broad discretion' in so doing, *id.,* at 369, 105 S. Ct., at 2002." <u>Florence County Sch. Dist. Four v. Carter …</u>, 510 U.S. 7, 16, … (1993). "This Circuit has held compensatory education appropriate relief where responsible authorities have failed to provide a handicapped student with an appropriate education as required by [the Act]." <u>Andrews</u>, 933 F.2d at 1584 (citing <u>Breen</u>, 853 F.2d at 857).

<u>Id.</u> at 1285 (emphasis supplied).  This goes beyond FAPE as "'compensatory awards must do more –they must *compensate.*' Compensatory awards should place children in the position they would have been in but for the violation of the Act." <u>Id.</u> at 1289 quoting <u>Reid</u>, 401 F.3d at 525, 528 (emphasis in org.). In <u>Draper</u> "compensatory" meant additional educational years of private placement, in <u>Greer v. Rome City Sch. Dist</u>. 950 F.2d    (11th Cir. 1990) where, like here, the issues were LRE and missing services, the courts rejected the restrictive self-contained placement, and found the need for addition services and related services. The relief sought and provided here was of a type customary in

LRE/services cases as in <u>E.G. v. Cobb Cnty Sch. Dist</u>, 119 LRP 37938 * 51(Ga. 2018), where the ALJ rejected the restrictive placement and was specific as to the placement required, ordered specific aspects of services such as SLP, OT and instruction, to be implemented through inclusion in a new IEP.

The ALJ concluded that "J.F. was unnecessarily and prematurely place in GNETS, and inappropriately continued in this restrictive placement since the October 2018 IEP Meeting." Doc. 1-1, p. 20. After curing the missing services which J.F. had challenged, the Final Decision ordered:

> J.F. shall receive eighteen months of individualized compensatory education services, designed by the IEP team and including Extended School Year, to close the achievement gap.

Final Decision, Doc.1-1, at 23. This addresses the time the ALJ concluded from GNETS placement to when he ordered removal, i.e., August 2018 through January 2020. <u>See</u>, Doc. 1-1, n. 8 (setting the time). Applying this against the <u>Draper</u> standard it is going back for 18 months of services missed in instruction, in social skills, in sensory needs, in integration, in SLP (including language) and in Occupational Therapy, and pushing in more than FAPE. Because compensatory means more than the recommendations for FAPE, as to these needs stated as to the time and type of services, i.e., more than the 2 thirty minute individual OT and the 2 30 minute group sessions and the consult a week, as that is the FAPE, not the compensatory component. Additionally, compensatory services in a social skill group, and SLP services as sought in all

the Cohen recommendations. If not ordered directly as stay put from Cohen, then Jamir's gaps in reading and fluency (words read per minute), and in understanding language he reads certainly are within his "individualized" needs "to close his achievement gap" in language, reading, fluency and comprehension. As Dr. Ward noted, and as Ms. J.A. always maintained, the segregation of Jamir in the GNETS was to his instructional and academic detriment. We have a highly intelligent kindergarten student of color who starts in the GNETS and is now in just 2 years 2 years behind and without SLP and OT.

The Defendants wanted to address all of this at the IEP meeting, but that document is still not final as the process was abused. Additionally, as the record of that meeting reflects, there was serious disagreement, records withheld, failure of plans and the inadequacy of assessment or baseline materials so one could not even set the starting point, -- the baseline, to then measure where we need to get Jamir back to and manage the 18 +months of compensatory services.

In addition to the prospective part of the stay-put injunction, the Court is asked to address those aspects of stay put delayed with additional compensatory services. The simplest of these are from January 21 until March 31, or an additional two months. Required services were not provided from January 21 through the end of school, May 15, or an additional 15 weeks of services. J.F. without the compensatory services has no the means to catch-up.

Because Draper and all the circuits permit the District Court to re-fashion an appropriate remedy, as the now necessary program for the child is now part of this placement. Draper, 518 F.3d at 1287. "Appropriate compensatory services cannot be replaced by services in a subsequent IEP." Boose v. Dist. of Col., 786 F.3d 1054, 1056 (D.C. Cir. 2015) citing, Reid, 401 F.3d at 523. This goes beyond the IEP and it is clear the ALJ's attempt to have the FCSD put the ordered services into the IEP is now eight month's stale and still undone.

## CONCLUSION

The Plaintiff FCSD ignored its key duty to J.F. after losing at the hearing. While they appeal, beyond the harm it has already caused, i.e., under federal and state law, FCSD must implement promptly and with fidelity the ALJ's decision. Georgia and the parents have agreed that this changes the placement. FCSD's case should not go forward and they should not be rewarded for their delay.

Defendants move for a mandatory stay put injunction. The only questions are what was being done by FCSD on January 22, 2020 through today, or the day this Court enters its Order, and does that comport with the ALJ's change of placement. We know there was delay, and we know much of the services were ignored. Defendant child asks the Court's relief.

Respectfully submitted this 23rd day of September, 2020.

/s/ Jonathan A. Zimring
Jonathan A. Zimring
Georgia Bar No. 785250
ZIMRING LAW FIRM
1425 Dutch Valley Place Suite A
Atlanta, GA  30324
zimring@zlawyers.com
404-607-1600

/s/ Craig Goodmark
Craig Goodmark
GA Bar No. 301428
GOODMARK LAW FIRM
1425 Dutch Valley Place Suite A
Atlanta, GA  30324
404-719-4848
cgoodmark@gmail.com

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies this motion and the supporting brief comply with the Local Rules and this Court's requirements.

<u>/s/ Jonathan A. Zimring</u>                <u>/s/ Craig Goodmark</u>
Jonathan A. Zimring                          Craig Goodmark
Georgia Bar No. 785250                  GA Bar No. 301428
ZIMRING LAW FIRM                      GOODMARK LAW FIRM
1425 Dutch Valley Place Suite A      1425 Dutch Valley Place Suite A
Atlanta, GA  30324                         Atlanta, GA  30324
zimring@zlawyers.com                   404-719-4848
404-607-1600                                  cgoodmark@gmail.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| |
|---|
| FULTON COUNTY SCHOOL DISTRICT, <br><br> *Plaintiff,* <br><br> v. <br><br> J.F., by and through J.A., and J.A., <br><br> *Defendants.* |

CIVIL ACTION
FILE NO. 1:20-cv-1675-ELR

## CERTIFICATE OF SERVICE

The undersigned herein certifies that the foregoing was filed and therefore served electronically to the identified opposing counsel for the Plaintiff using the Court's electronic filing and service system.

This 23rd day of September, 2020.

*/s/ Jonathan A. Zimring*
Jonathan A. Zimring
Georgia Bar No. 785250

ZIMRING LAW FIRM
1425-A DUTCH VALLEY PLACE
ATLANTA, GA 30324
*zimring@zlawyers.com*
*404-607-1600*

*/s/ Craig Goodmark*
Craig Goodmark
GA Bar No. 301428

GOODMARK LAW FIRM
1425 Dutch Valley Place Suite A
Atlanta, GA 30324
cgoodmark@gmail.com
404-719-4848