IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FULTON COUNTY SCHOOL DISTRICT,

*Plaintiff*,

v.

J.F., by and through J.A., and J.A.,

*Defendants*.

CIVIL ACTION
FILE NO. 1:20-cv-1675-ELR

## **DECLARATION OF J.A., MOTHER of J.F.**

1. My name is J.A, I am the mother of J.F. I give this declaration in the above referenced case for all purposes permitted by law. I am over the age of 18, competent to testify and offer this testimony is based upon my own personal knowledge, and experiences:

2. I, along with my son, J.F., are plaintiffs in the above styled matter. I attest that Exhibits 1 through 43 submitted in support of the motion for summary judgement are a true and accurate copies of correspondence related to the issues presently before this Court. As well, Exhibit 44, Summary of Correspondence Between JF and FCSD from January 24 to July 16, 2020, is an accurate summary of the correspondence between counsel for J.F, J.A., FCSD and counsel for FCSD, provided in Exhibits 1 through 41, authenticated above.

3. In January 2020, J.F. had been in the GNETS for eighteen plus months from his beginning there (not counting the time he had been withdrawn to avoid the GNETS) and it was thirteen plus months since the due process hearing request.

4. On January 24, 2020, I wanted to know when J.F. would leave the GNETS and when the IEP meeting to get that done would occur. I wanted J.F. out of GNETS immediately and placed in an appropriate setting. I wanted to know what the plan for a transition out of GNETS would be. I did not get any information from FCSD about that until several weeks after the Order was issued.

5. The notice of the IEP meeting and parent invitation was placed in J.F.'s backpack on February 19, 2020 along with FCSD's draft proposal for J.F.'s IEP. Ex. 38. The proposed IEP offered no interim services or transition plan and called for a meeting at Dolvin Elementary. Id. This ordered change of placement was 23 months since the placement and 19 months since the placement the Court found inappropriate was implemented.

6. I continued to seek information about the details of J.F.'s planned transition including the transition services and the proposed location where J.F. would be enrolled after leaving GNETS. Ex. 6.

7. I was told that J.F. had to return to Dolvin Elementary School where J.F. had suffered significant and repeated trauma during the 2017-2018 school year. See Ex. 8. I and I had my attorneys object to this action.

8. I attended an IEP meeting for J.F. on February 25, 2020, after over a month of delay (35 days). Ex. 38, 39.

9. At the meeting, I was not provided any details regarding how J.F. would be safely transitioned or moved out of GNETS, what behavioral supports would be considered by the IEP Team to ensure FAPE, or how the Court's Order would be implemented.

10. FCSD permitted J.F. to remain at New Prospect Elementary School, but they did not provide any transition plan or explain how J.F. would be supported during this time or be moved out of the GNETS into team taught classes.

11. During the meeting, FCSD openly displayed hostility regarding the ALJ's Final Decision. I was told by FCSD employees that they did not agree with the Court's decision. I was told by school members of the IEP Team, including several from GNETS, that they were unaware of my requests for information and documents. I was not provided with records which should have existed were not made available to Defendants. This included actual assessment data, implementation data on instruction.

3

12. At the IEP meeting I was given a proposed IEP that was substantially unchanged from the IEP written for J.F. at GNETS prior to the Final Decision. The changes were not supported by any educational data and services ordered by the Final Decision were not added. Examples of the lack of direct data was that the achievement and progress monitoring data was not seen as reliable especially from I Ready Reading, and that data was not tied to specific goals and specific objectives. See Ex. 39.

13. This draft IEP had information from prior testing, psychological and what FCSD said they used to monitor progress in reading and math, its I Ready scores. The psychological scores had Jamir's IE from May 2018 as above 100, with a then measured FSIQ at 104, which I saw as an underrepresentation of his intelligence. The achievement scores from FSCD were much lower in the KTEA-II, and in the I Ready Reading phonological awareness, phonics, vocabulary comprehension literature all stated at the kindergarten level, though this was from the end of December 2019, and he had finished half of the 2nd grade. I had and continue to have grave concerns with the instruction and that he was allowed to fall substantially below grade level, even in such short a time in the GNETS. I was particularly concerned that his reading fluency score, or how many words he reads per minute was at 28 CWPM or correct words per minute. We

presented generally accepted data that in the middle of the second grade at the 50% level children were reading 80 to 84 CWPM. See Ex. 39, p. 3-4.

14. I was surprised to see the IEP included a statement that part of Jamir's language impairment/articulation disorder was due to his race as a young Afro-American child, i.e., his impairment was actually AAE (Afro-American English), rather than a disorder that should be treated and could be corrected. FCSD had presented this theory at the due process hearing but the judge had rejected that and agreed with Mindy Cohen, a private speech therapist that had worked with J.F. See Ex. 39, p. 6 (3rd Sentence of bottom paragraph on page).

15. At the IEP meeting, many of the FCSD and GNETS staff FCSD brought to the IEP meeting were unprepared to collaborate or contribute to an appropriate new IEP or to a transition plan.

16. Dr. Jennifer Alexander, the BCBA FCSD called at trial who had re-written the BIP in 2018, told me, and the other members of the IEP Team, during the IEP Team meeting she could not write a plan or amend the BIP as she was now unfamiliar with J.F. She had not been asked by FCSD to observe J.F. at any time since the spring of 2018, nor in the five (5) weeks since the transition was ordered.

17. I was hoping that FCSD would complete the IEP for J.F. However, the IEP Fulton created for J.F. on February 25, 2020 was <u>not</u> complete and did not contain all the components of the ALJ's Final Decision.

18. The FCSD IEP did not include the recommendations of Ms. Cohen's IEE report, full details of the occupational therapy services ordered by the ALJ, or any information regarding the compensatory educational services required by the ALJ. Ex. 39, p. 16-17.

19. I was concerned that <u>FCSD had no transition plan</u>, and the IEP was lacking in necessary accommodations and supports, particularly given the delays and inadequacy of services from FCSD. This lack of transition caused continued delay as J.F. remained in segregated classes from January until after the 2020 Spring Break.

20. FCSD was unable to verify J.F.'s present levels of educational performance, relying upon informal scores from a computer based tool, the I Ready that FCSD told me during the meeting were not valid for J.F. because of his disabilities.

21. During six (6) hours of meeting, FCSD did not offer any specific plan for transitioning J.F. out of GNETS in a safe, effective and appropriate way. When I asked about J.F. leaving GNETS and how students typically are transitioned out I was told by FCSD administrators that J.F. would be

treated differently because "he didn't earn his way" out of GNETS and so he would not receive the positive recognition for his educational progress from his teachers and staff. Because FCSD and GNETS didn't agree with the judge's decision they were not planning on following their customary process of celebrating the student, as he was now free of GNETS.

22. I did not agree that the IEP of February 25, 2020 was appropriate or calculated to confer any meaningful educational benefit to J.F. Also, the IEP did not implement the orders from the Court. Despite my request to implement the Court's order, from February 25, 2020 to March 15, 2020 (the date of school shutdown due to COVID-19), and actually until school was resumed, J.F. remained in GNETS without any transition plan.

23. I provided FCSD proposed IEP additions missing from the document to try to correct it and move forward, but many of these were rejected by FCSD. I asked for valid assessments to track J.F.'s progress into the co-taught class but FCSD administrators refused to agree to this at the IEP Meeting.

24. In March 2020, J.F. was almost two grade levels behind in reading and one grade behind in math. This was then made worse by delay in getting J.F. into an appropriate educational placement and receiving the compensatory education the judge ordered.

25. Since January 21, 2020, J.F. did not, and still has not, received the services such as speech/language therapy, occupational therapy, counseling or direct behavioral support from a BCBA, after the ALJ's Final Decision that ordered J.F. to receive such services.

26. J.F. has not made any progress since January 21, 2020. I disagreed with the IEP created because I did not believe the plan implemented was appropriate. I also did not believe the plan met the requirements of the Final Decision. Specifically, the plan lacked related services, had inappropriate goals and objectives and was not based on any assessments except where J.F.'s experts were allowed to recommend the services.

27. I wanted J.F. to be reintroduced into additional mainstream classes or meet and additionally interact with mainstream age appropriate peers in January 2020. This did not happen and J.F. was restricted to the GNETS from January to March 2020, separate from other second graders, not even allowed to use the main playground. When school changed due to Covid-19 he had not been allowed this transition into mainstream co-taught classes as we have sought for years and as was ordered on January 21.

28. On several occasions, I provided FCSD proposals for appropriate IEP services, suggestions to resolve the compensatory education requirement ordered by the ALJ, and authorized global settlement terms. These

included proposed accommodations, a transition plan, portions of the PLOP or present levels of functioning or performance, the specifics of the goals and objectives and services recommended by Ms. Cohen and by Ms. Wing. In response, FCSD has either rejected outright much if not all of the positions presented or made incoherent inquiries into the positions stated in order to inject further delay from compliance with the Court's January 21st Order.

29. I wanted J.F. to have direct in-person transition services in January 2020 and receive co-taught and general education instruction. J.F. did not receive this instruction and it was not until March 31, 2020, when J.F. was removed from GNETS (virtually), and he connected via internet about two (2) weeks after children in regular education classes were provided such internet and video instruction.

30. I notified FCSD of my disagreement with the IEP and the lack of any appropriate transition plan created on February 25, 2020 but despite my efforts to reach consensus with FCSD on the IEP, including the provision of the services ordered by the ALJ, I told FCSD to implement the IEP.

31. I sent notice to FCSD on May 8, 2020 via email that Jamir received instruction in the GNETS from January 21 to March 30; Jamir started in the co-taught classroom for the first time 70 total days after the ALJ's order to

move him to co-taught classes; Jamir had received a total of 2 hours of speech therapy (2-30 min. sessions/week) since January 21 and have been provided choice boards which is not what was recommended in his IEP; Jamir had received a total of 2 hours of occupational therapy (4-30 min. sessions/week) since January 21 and have been provided choice boards which is not what was recommended in his IEP; Jamir did not receive any teleservices until April 21 -- over month after school's closed; Jamir did not receive any instruction in social studies and science at all; Jamir did not receive any direct reading instruction, nor has he been provided any time with a reading specialist that is implementing any Orton-Gillingham program. Ex. 40.

32. FCSD confirmed via email that J.F.'s instruction had not been in accord with the IEP created for him on 2/25/2020. Ex. 41. I responded to that email again seeking clarification about the nature of the services being offered by FCSD and asking for private compensatory educational services.

33. I demanded that J.F. receive the compensatory services ordered by the ALJ through the end of in-person instruction. I explained my disagreements with the FCSD IEP. I was not provided any prior written notice from FCSD about their decisions, nor did J.F. ever receive a transition ceremony upon leaving the GNETS. Ex. 42.

34. J.F. did not receive any direct reading instruction or provided any time with a reading specialist implementing any Orton-Gillingham program. Id. I requested compensatory education on May 8, 2020 for school's failure to provide the services identified in his IEP.

35. I did not receive any response from FCSD until May 15, 2020. Ex. 42. When FCSD did respond, I was informed by Tris Gilland, without collaboration or discussion, that Extended School Year (ESY) is four hours for each goal scheduled and that J.F. had three reading goals, J.F. would receive 60 minutes of virtual speech therapy and 30 minutes of virtual occupational therapy per week. Ms. Gilland then provided me data regarding J.F.'s performance that confirmed that no service provider had been working with him until late April. Id.

36. The delay in leaving GNETS and providing J.F. educational instruction and services caused J.F. harm. J.F. has not made any progress on his reading skills. He remains behind in math.

37. J.F. was provided limited summer instruction from FCSD, however he did not make any progress on his IEP goals. The services offered to J.F. were inadequate to address his educational weaknesses and were not based upon J.F.'s present levels of performance or valid assessment measures.

38. On June 9 I notified FCSD that the ESY and the IEP being followed for Jamir does not provide FAPE and will not close the achievement gap created by the previous denial of FAPE. Ex. 43.

39. As the summer ended, I requested but was not given any, notice of an IEP meeting regarding J.F.'s educational program during the 2020-2021 school year. I was told that J.F. could either come to school or receive virtual instruction from a third-party vendor.

40. Ultimately, FCSD ordered me to return J.F. to Dolvin Elementary School. No IEP meeting was called to discuss this change in educational placement even though FCSD's unilateral change would have forced J.F. to return to an educational environment where he was repeatedly secluded and physically restrained by educators working for FCSD.

41. I disagreed with any suggestion that J.F. would return to Dolvin Elementary School. At the same time, I had given notice to FCSD that I was moving out of the Dolvin geographic area and would be attended Liberty Point Elementary School early in the school year. I did not want J.F. to transition two times early in the school year so I asked FCSD to allow me to enroll J.F. directly into Liberty Point Elementary as we would be moving in a matter of week. I was told that FSCD administrators would assist me in completing that transfer, however, I never received any direct help.

42. J.F. now attends Liberty Point Elementary. His IEP has not been changed since February 25, 2020. He has not received any compensatory educational services from FCSD. I have received emails from FCSD offering to discuss compensatory educational services, however, FSCD has never provided, or even offered to provide, the express services listed in the ALJ's order. As a result, J.F. continues to fall farther behind his peers and will need even more remediation to close the existing achievement gap.

43. J.F. still has not mastered the basics of reading, when cognitively he has the ability to do so. J.F. has not made progress on his math skills, when he has capacity for such progress. Id. And while COVID-19 may have eliminated some of the opportunities for behavioral and social development, J.F.'s lack of progress on critical language and sensory integration skills has adversely impacted his educational performance. Id.

44. I have observed J.F. in virtual classes several times. From my observations, I did not recognize any reading curriculum being used. He has an Epic account that acts as a kid's version of kindle. He works on sight words with his co-teacher and comprehension tests on ReadWorks. I have not seen any reading curriculum. Not even in the textbooks included. I do not know his exact reading level. I have not seen any evidence of Orton-

Gillingham reading instruction. For J.F., the reading seems like this missing piece and it is what causes him the most frustration. Because he has not learned to read yet, J.F. has to be read to, and most of his writing has to be written for him.

FURTHER AFFIANT SAYETH NAUGHT.

This statement is provided pursuant to the laws of the United States, and I so declare based upon the pains and penalty of perjury. *See* 28 U.S.C. Sec. 1746.

DATED: This the __23_rd day of September, 2020.

_____
J.A., mother of J.F.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| FULTON COUNTY SCHOOL DISTRICT,<br><br>*Plaintiff*,<br><br>v.<br><br>J.F., by and through J.A., and J.A.,<br><br>*Defendants*. | CIVIL ACTION<br>FILE NO. 1:20-cv-1675-ELR |

## **AFFIDAVIT OF CRAIG GOODMARK**

1. My name is Craig Goodmark. I give this declaration in the above referenced case for all purposes permitted by law. I am over the age of 18, competent to testify and offer this testimony is based upon my own personal knowledge, and experiences:

2. I am lead counsel in the above styled matter. I attest that Exhibits 1 through 43 submitted in support of the motion for summary judgement are a true and accurate copies of correspondence related to the issues presently before this Court. As well, Exhibit 44, Summary of Correspondence Between JF and FCSD from January 24 to July 16, 2020, is an accurate summary of the correspondence between counsel for J.F, J.A., FCSD and counsel for FCSD, provided in Exhibits 1 through 42, authenticated above.

3. I emailed counsel for Plaintiff seeking implementation of the Final Decision, including J.F.'s immediate transition out of the GNETS. Ex. 1. My email stated, "I am interested in moving this process forward and appreciate your cooperation in getting all the proper people and information to the IEP table." Exhibits for Summary Judgment, Ex. 1[1].

4. On January 27, 2020 I received a response to my email from counsel for Defendants. No action was indicated. Counsel asked for more time. Ex. 2.

5. There was no contact from FCSD after they asked for more time. I emailed FCSD again on February 6, 2020 and FCSD responded by suggesting an IEP date of March 12, 2020 or fifty-one (51) days after the Final Decision had been issued and five (5) weeks into the future for just the ordered meeting. Ex. 3-5.

6. I emailed counsel for FCSD rejecting this date as too long to wait, and sought information about transition and where J.F. would receive services once out of GNETS, I emailed Defendants seeking information. I also stated expressly that J.F. "do[es] not waive any rights to the services as of the Court's January 21 order and need to identify that we will pursue additional compensatory educational services for the additional lost time. We also see

---

[1] To avoid confusion with the Complaint, Defendants/Counter-Plaintiffs have provided all affidavits and exhibits in support of this motion separately and numbered their exhibits consecutively.

further delay as making a compensatory plan more and more difficult." Ex. 6. FCSD did not set any meeting date in response.

7. I sent notice to FCSD of the intentional and illegal violation of J.F.'s civil rights and sought immediate and effective remediation. Ex. 9. I asked for an immediate IEP meeting and the collaborative development of an appropriate educational plan for J.F. with sufficient supports and services based upon the expert evaluations identified by the ALJ in the Final Decision, as per the direction of the ALJ. Id.

8. On February 18, 2020, I again requested information about J.F.'s transition, the services J.F. would receive and the data upon which decisions would be based. Ex. 12, p. 1.

9. Following the February 25 IEP meeting, counsel engaged in an extended back and forth correspondence regarding the IEP for J.F. See Ex. 42 (Summary of post-IEP Correspondence), Ex. 15-32. (copies of the correspondence).

10. I have not previously been asked to present my client's objections to an IEP in a "redline" document despite having already provided written and specific objections to the IEP. Ex. 30.

FURTHER AFFIANT SAYETH NAUGHT.

This statement is provided pursuant to the laws of the United States, and I so declare based upon the pains and penalty of perjury. *See* 28 U.S.C. Sec. 1746.

DATED: This the 23rd day of September, 2020.

_____
Craig Goodmark